Filed 9/24/21  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>FRANCISCO CORTEZ RODRIGUEZ,<br><br>     Defendant and Respondent. | F080268<br><br>(Tulare Super. Ct. No. PCF358304)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tulare County.  Michael B. Sheltzer, Judge.

Tim Ward, District Attorney, Dan Underwood, Chief Deputy District Attorney, Dave Alavezos, Jessica Weatherly, Adam Clare, and Katherine Smith, Deputy District Attorneys, for Plaintiff and Appellant.

Susan L. Jordan, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

## INTRODUCTION

Respondent and defendant Francisco Cortez Rodriguez (Rodriguez), who was 70 years old and diagnosed with Alzheimer's dementia, was arrested after an altercation with a security guard at a market. He was charged with four felony offenses with one prior strike conviction. After being held to answer, he moved for pretrial mental diversion pursuant to Penal Code[1] sections 1001.35 and 1001.36, based on the argument that his Alzheimer's dementia was a significant factor in the commission of the charged offenses. The Tulare County District Attorney's office opposed the diversion motion. After a lengthy evidentiary hearing, including testimony from an expert about Rodriguez's mental disorder, the trial court overruled the district attorney's objections, granted Rodriguez's motion, and placed him on pretrial mental health diversion with a specific treatment plan pursuant to section 1001.36.

Thereafter, the People of the State of California, as appellant and represented by the district attorney, filed the instant appeal from the trial court's order that granted the diversion motion.

Rodriguez argues the People lack the statutory right to file an appeal from the trial court's order. In the alternative, Rodriguez asserts the People have raised a new objection to the testimony of the expert that was not raised at the diversion hearing and have forfeited appellate review of this contention.

We affirm. We find the People have a statutory right to file an appeal from the trial court's order granting pretrial mental health diversion based on section 1238, subdivision (a)(1). We further find the People forfeited review of the new argument about the expert testimony being raised on appeal, based on the People's concession that they did not raise this objection at the diversion hearing, and well-recognized authorities that hold such challenges are forfeited if not raised below.

_____

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2

## FACTS

On November 3, 2017, B.S. was working as the security guard for Guadalajara Meat Market in Porterville.[2] He saw Rodriguez in the parking lot, jumping in front of vehicles and trying to stop customers. B.S. gave Rodriguez $2 and asked him to leave the property. B.S. went into the store and was contacted by a female customer, who reported that Rodriguez solicited her to commit a sexual act.

B.S. returned to the parking lot and saw Rodriguez relieving himself in public. B.S. told Rodriguez to leave, but he refused. B.S. said he was going to place Rodriguez in handcuffs until the police arrived. Rodriguez told B.S. that if he touched him, he was going to kill him. B.S. tried to detain Rodriguez, but Rodriguez hit B.S. in the face with a stick that was four to five feet long. Rodriguez said his friends were going to "get" B.S. and beat him up.

The police responded to the market and tried to take Rodriguez into custody. The officers believed he was intoxicated based on his watery and bloodshot eyes, slurred speech, and the strong odor of an alcoholic beverage coming from him. Rodriguez was still holding the stick and refused to comply with the officers' orders to put down the stick. When the officers attempted to detain him, Rodriguez resisted and tried to pull away from them. He was eventually restrained, placed in handcuffs, and seated in a patrol car. While he was in the car, he kept shouting in Spanish and threatened to kill the officers when he got out of jail or have someone do it for him.

Rodriguez was arrested and booked into custody at the jail.

## PROCEDURAL BACKGROUND

On November 7, 2017, a felony complaint was filed in the Superior Court of Tulare County charging Rodriguez with count 1, assault with a deadly weapon, a stick (§ 245, subd. (a)(1)); count 2, criminal threats (§ 422), with an enhancement for personal

---

[2] The following facts are from the preliminary hearing.

use of a deadly weapon (§ 12022, subd. (b)(1)); and counts 3 and 4, resisting an executive officer (§ 69); with one prior strike conviction and one prior serious felony enhancement.

On the same day, Rodriguez pleaded not guilty and denied the special allegations. The court set bail and Rodriguez remained in custody.

**Section 4011.6 Report**

On November 17, 2017, the court granted the request of Rodriguez's attorney for a mental health evaluation pursuant to section 4011.6.[3] Rodriguez remained in jail.

On December 7, 2017, a licensed mental health clinician with Corizon Behavorial Health Services filed a mental health assessment after meeting with Rodriguez in jail. As the court later stated, the report concluded that Rodriguez met the diagnostic criteria for bipolar disorder based on symptoms of pressured speech, distractibility, inflated sense of self, decreased need for sleep, flight of ideas, and some psychomotor agitation.

On December 8, 2017, the court reviewed the section 4011.6 report, and ordered the probation department to determine whether Rodriguez should receive an honor release.

**Probation Report About Pretrial Release**

On December 27, 2017, the probation officer filed the requested report. The probation officer tried to interview Rodriguez, who remained in custody at the jail, but Rodriguez's answers to general questions "were sometimes nonsensical, and he seemed to have difficulty comprehending" the questions.

Rodriguez said he did not know why he was in custody; he did not remember what happened on the day of his arrest; and he was not drinking that day. Rodriguez repeatedly said that he had only been in custody three or four days, even though he had

---

[3] Section 4011.6 provides for the transfer of jail inmates who may be mentally disordered to a facility for 72-hour treatment and evaluation pursuant to Welfare and Institutions Code section 5150. (*Del Castillo v. Superior Court* (2019) 38 Cal.App.5th 1117, 1121.)

been in jail since November 3, 2017. Rodriguez also said he woke up feeling hung over on the morning of the interview and claimed he had consumed alcohol the night before, even though he was in jail and had no access to alcohol.

The probation officer determined Rodriguez had 70 arrests for public intoxication since 1995, plus prior incidents of domestic violence and assault.

The probation officer spoke with Rodriguez's wife, who stated he was diagnosed with dementia one year earlier. He had a history of alcoholism but stopped drinking after he was released from custody in April 2017, following his most recent prior arrest. His wife explained that while he remained sober, he would "consistently wake up in the mornings stating he needs to drink because he feels as though he is hung over because he drank the night before, but Mrs. Rodriguez stated [he] had not consumed any alcohol the night before." She reported that on the day of his arrest, he snuck out of the house and started drinking alcohol again. She wanted him released from jail but did not think she could care for him by herself and had considered admitting him into an assisting living facility.

The probation officer recommended against pretrial release because of Rodriguez's alcoholism and aggressiveness, and his wife's belief that she could not care for him by herself.

On March 6, 2018, the court granted Rodriguez's motion for pretrial release subject to electronic monitoring. Thereafter, Rodriguez complied with the terms of his pretrial release and electronic monitoring for the entirety of the proceedings and did not commit any new violations of law.

**The Information**

On May 1, 2018, the court conducted the preliminary hearing and held Rodriguez to answer.

5

On May 4, 2018, the information was filed that alleged the same felony counts as in the complaint, including the prior strike conviction. Rodriguez again pleaded not guilty and denied the allegations.

## PRETRIAL MENTAL HEALTH DIVERSION

Effective on June 27, 2018, the Legislature enacted a discretionary pretrial diversion program for people with qualifying mental disorders. (§§ 1001.35, 1001.36, added by Stats. 2018, ch. 34, § 24; *People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*); *People v. Moine* (2021) 62 Cal.App.5th 440, 447 (*Moine*).) The provisions of section 1001.36 are fully retroactive to cases not yet final on appeal. (*Frahs, supra*, 9 Cal.5th at pp. 624, 630.)

Section 1001.36 states that a trial court may grant pretrial diversion if it finds all of the following. First, the court must be "satisfied that the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders .…" (§ 1001.36, subd. (b)(1)(A).)[4] "Section 1001.36, subdivision (b)(1)(A) defines a qualifying mental disorder as one that is 'identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia.' " (*Moine, supra*, 62 Cal.App.5th at p. 449.)[5]

---

[4] Unless otherwise indicated, all further citations to the "DSM-5" are to the fifth and current edition of the Diagnostic and Statistical Manual of Mental Disorders (2013), which the trial court and the parties discussed at the diversion hearing, and the court relied on to grant Rodriguez's motion for diversion.

The DSM-5 is "a handbook published by the American Psychiatric Association, used by health care professionals all over the world as an authoritative guide to the diagnosis of mental disorders." (*Acevedo Granados v. Garland* (9th Cir. 2021) 992 F.3d 755, 760, fn. 1; *People v. Johnson* (2015) 235 Cal.App.4th 80, 83 & fn 2.)

[5] Effective January 1, 2019, section 1001.36 was amended to state that defendants charged with murder, voluntary manslaughter, and enumerated sexual assault offenses are

6

"Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by *a qualified mental health expert*. In opining that a defendant suffers from a qualifying disorder, the qualified mental health expert may rely on an examination of the defendant, the defendant's medical records, arrest reports, or any other relevant evidence." (§ 1001.36, subd. (b)(1)(A), italics added.)[6]

Second, the court must be "satisfied that the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) "A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense." (*Ibid.*)

Third, "a qualified mental health expert" must opine that "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) Fourth, subject to certain exceptions, the defendant must consent to diversion and waive his or her right to a speedy trial. (*Id.*, subd. (b)(1)(D).) Fifth, the defendant must agree to comply with treatment as a condition of diversion. (*Id.*, subd. (b)(1)(E).) Finally, the court must be "satisfied that

---

ineligible for diversion. (*Frahs, supra*, 9 Cal.5th at pp. 626–627; § 1001.36, subd. (b)(1)(F); Stats. 2018, ch. 1005, § 1.)

[6] As the People concede, section 1001.36 does not define the phrase "qualified mental health expert."

the defendant will not pose an unreasonable risk of danger to public safety … if treated in the community." (*Id.*, subd. (b)(1)(F).)

"At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of eligibility for diversion and that the defendant and the offense are suitable for diversion. The hearing on the prima facie showing shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel…." (§ 1001.36, subd. (b)(3).)[7]

"If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion. [Citations.] The maximum period of diversion is two years. [Citation.] If the defendant is subsequently charged with an additional crime, or otherwise performs unsatisfactorily in the assigned program, then the court may reinstate criminal proceedings. [Citation.] 'If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, *the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion'* and *'the arrest upon which the diversion was based shall be deemed never to have occurred.'* [Citation]" (*Frahs, supra*, 9 Cal.5th at p. 627, italics added.)

The court's decision on a motion for diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence. (*Moine, supra*, 62 Cal.App.5th at pp. 447–449; *People v. Oneal* (2021) 64 Cal.App.5th 581 [279 Cal.Rptr.3d 142, 149].)

---

[7] The amendments that were effective on January 1, 2019, also added subdivision (b)(3) to section 1001.36, prior to when Rodriguez filed his motion for diversion. (Stats.2018, ch. 1005, § 1, eff. Jan. 1, 2019.)

**RODRIGUEZ'S MOTION FOR DIVERSION**

On June 14, 2019, Rodriguez filed a motion for pretrial mental health diversion pursuant to section 1001.36. The motion stated Rodriguez's physician diagnosed him with "Alzheimer's Dementia" prior to his arrest in this case. Rodriguez had been charged with alcohol-related offenses "dozens" of times in the past. In the spring of 2017, Rodriguez was released from custody after his most recent prior arrest, he was closely watched by his family, and he stopped drinking. Rodriguez's symptoms from Alzheimer's dementia, however, led him to falsely believe he was suffering from a hangover and he wanted to drink again. On the day of his arrest in this case, he left the family home and suffered a relapse into alcoholism, which exacerbated his Alzheimer's dementia and resulted in his arrest for the charged offenses.

Rodriguez's motion asserted that symptoms from Alzheimer's dementia motivated his criminal behavior and played a significant role in the commission of the charged offenses:

> "No one can know what was going on in Mr. Rodriguez's head on November 3, 2017, perhaps Mr. Rodriguez least of all. The most likely series of events is that he was experiencing uncomfortable symptoms, including headache, which he interpreted as hangover, despite being sober for months at that point. Both his [adult] daughter and probation [in the pretrial release report] relate Mr. Rodriguez complaining of hangover when it is clear that he had not been drinking prior …. Recalling only the long-term memory that drinking alcohol when hung-over can alleviate the negative symptoms, and *forgetting due to Alzheimer's* that he had not consumed alcohol recently or for months, he sought to 'cure' his hangover by drinking alcohol. Thus, though alcohol was a factor in the charged behavior, the alcohol consumption was itself due to the underlying mental illness: Alzheimer's Dementia."[8]

The motion acknowledged that Rodriguez would suffer from Alzheimer's dementia for the rest of his life and his mental health condition would become worse but

---

[8] As will be explained below, the district attorney's opposition quoted the first sentence of this paragraph out of context.

argued he would benefit from treatment for his condition through pretrial diversion since he was already responding at home under the care of his two physicians.

The motion was supported by documentary exhibits consisting of a letter from Dr. Francis Cunanan, M.D., and a review of Rodriguez's medical records conducted by Amber Alves-McAuley, a licensed clinical social worker (LCSW) with the public defender's office.

**Dr. Cunanan's Letter**

Dr. Cunanan's letter, dated September 11, 2017 (two months before Rodriguez was arrested in this case), stated Rodriguez (born 1947) had been his patient for the past five years, and he had "multiple medical problems which include Alzheimer's Dementia." Dr. Cunanan stated that inpatient rehabilitation would not be appropriate because Rodriguez was suffering from "worsening and incurable Alzheimer's Dementia," and he would be "better treated at home with his current medications; furthermore, he has stopped drinking altogether."

**Ms. Alves-McAuley's Records Review**

Ms. Alves-McAuley submitted a report in support of the motion. She had over 12 years of experience in social services and previously worked as a therapist at the Visalia Adult Integrated Clinic, where she conducted mental health assessments and provided therapy services.

***Interview with Rodriguez's family***

Ms. Alves-McAuley's report summarized her meeting with Rodriguez and his family. Rodriguez was now 71 years old, out of custody, and lived with his wife and adult children in Porterville. His wife and daughter said he was unable to directly answer questions because he suffered from Alzheimer's dementia, memory loss, and confusion. Rodriguez had worked in the fields until he retired in 2006.

Rodriguez's prior record included misdemeanor charges of child endangerment, public intoxication, battery, resisting arrest, trespassing, false information to the police,

criminal threats, possession of a weapon, hit and run, driving on a suspended license, petty theft, driving under the influence, and malicious mischief, and felony charges of criminal threats and domestic violence.

Prior to his arrest in this case, Rodriguez's last conviction for public intoxication was in March 2017. Rodriguez's daughter said he had a serious problem with alcohol, his prior offenses were related to his alcoholism, there were times the family called the police because of domestic violence when he was drunk, and several times he drank so much that he was admitted to the hospital. Rodriguez had previously completed a court-ordered residential treatment program and attended Alcoholics Anonymous meetings.

Rodriguez's daughter believed he was diagnosed with Alzheimer's dementia four years earlier. His daughter noticed symptoms several years before the diagnosis because he got lost, forgot his parents died, and had problems understanding his daily assignments when he was still working.

Rodriguez's daughter stated that since he had been released from jail in the instant matter, he was taking his medication and doing much better. His daughter and her family moved from Fresno to Porterville to be closer to her parents and help care for Rodriguez. His adult children and older grandchildren cared for him, and he had not wandered away again because of increased supervision. His family intended to continue to care for Rodriguez at home, and they stated they would reach out for additional support if his condition became unmanageable.

### Dr. Cunanan's Records

Ms. Alves-McAuley's report included a review of Rodriguez's medical records from Dr. Cunanan, his primary care physician who diagnosed him with Alzheimer's dementia. Dr. Cunanan's records "indicate[d] symptoms of dementia in the months leading up to the offenses." On August 28, 2017, Dr. Cunanan's records stated that Rodriguez's wife reported he was " 'getting worse' and was 'agitated and anxious.' "

11

Dr. Cunanan saw Rodriguez on September 11 and October 5, 2017, and described Rodriguez as " 'agitated and anxious.' "

### Dr. Thiagarajan's Records

Ms. Alves-McAuley report stated that Dr. Ramu Thiagarajan, M.D., was Rodriguez's neurologist. Dr. Thiagarajan's records for February 11, 2019, stated that Rodriguez was diagnosed with Alzheimer's dementia, and his " '[c]ognitive decline has been apparent for two years. His mental status appears to be gradually deteriorating over the last 6 months.' " Dr. Thiagarajan reported Rodriguez " 'cannot recognize familiar faces, find his way home, or remember the date,' " he experienced confusion and disturbed sleep, but his sleep improved with adjusting his medication.

Dr. Thiagarajan's records stated that an MRI was performed on Rodriguez's brain, and the results " 'showed significant atrophy and white matter ischemic changes consistent with vascular dementia.' " Rodriguez was taking psychotropic medications including Namzaric, Gabapentin, Buspirone, Seroquel, and Cymbalta.

### Recommendation

Ms. Alves-McAuley's report stated that based on her review of Rodriguez's medical records and interviews with his family, she believed he suffered from "the mental disorder Alzheimer's dementia," and his mental disorder was a major factor in the current charges because Rodriguez was reportedly suffering from symptoms including confusion and memory impairment at the time of his arrest.

> "Although Mr. Rodriguez has a history of alcoholism, I believe it is likely that his actions in the present case are related to his mental illness. Mr. Rodriguez's family reports that leading up to his arrest[,] he had been experiencing memory problems and confusion, and had wandered away from home on numerous occasions. Mr. Rodriguez's daughter states that he would remember that he had once liked alcohol and would leave the house to get a drink, forgetting that he no longer drank. Since that time, Mr. Rodriguez was started on an effective psychiatric medications regimen, and his family rearranged their schedules to ensure that Mr. Rodriguez is being adequately supervised.

12

"Mr. Rodriguez's family is abundantly clear that Mr. Rodriguez must take his medications consistently as prescribed, and that he must be watched carefully to avoid the possibility of wandering off and getting into trouble again.

"*Although Mr. Rodriguez suffers from an incurable and worsening disease, in my opinion his family and doctors have found a way to work together and manage his symptoms.* I believe that continued medication management as well as the support of his family will maintain Mr. Rodriguez's current stability and allow him to safely remain in his home and avoid reoffending." (Italics added.)

## THE DISTRICT ATTORNEY'S OPPOSITION

On July 11, 2019, the district attorney filed opposition and asserted the statutory requirements for diversion "are far more rigorous than simply granting diversion to every defendant who comes to court and says, in effect, 'I have a mental illness, I want to be diverted.' "

The district attorney challenged the following statement in Rodriguez's motion: " 'No one can know what was going on in Mr. Rodriguez's head on November 3, 2017.' " (Bold print omitted.) The district attorney asserted that such a statement was "utterly incompatible" with the statutory requirements for diversion because "[h]ow can [Rodriguez] argue that he knows that his mental disorder played any role when 'no one can know what was going on in Mr. Rodriguez's head…?' "[9]

The district attorney posited that Rodriguez's doctor "might know what was going on in [his] head, or at least have an opinion whether [his] mental disorder played a

---

[9] The district attorney quoted this statement from Rodriguez's motion out of context. As noted above, the rest of the paragraph connected Rodriguez's lack of short term memory as a result of Alzheimer's dementia, to his erroneous belief that he had a hangover and needed to start drinking again: "Recalling only the long-term memory that drinking alcohol when hung-over can alleviate the negative symptoms, and *forgetting due to Alzheimer's* that he had not consumed alcohol recently or for months, he sought to 'cure' his hangover by drinking alcohol. Thus, though alcohol was a factor in the charged behavior, the alcohol consumption was itself due to underlying mental illness: Alzheimer's Dementia."

significant role in the commission of the charged offense. Unfortunately, Dr. Cunanan renders no such opinion. All Dr. Cunanan's statement indicates is that [Rodriguez] is [his] patient and has Alzheimer's Dementia," and the physician's letter did not address Rodriguez's arrest.[10]

Next, the district attorney argued Rodriguez improperly relied on Ms. Alves-McAuley's report to support "the notion" that his mental disorder of Alzheimer's dementia played a significant role in the commission of the charged offenses.

> "First, LCSW Amber Alves-McAuley is not a medical doctor and her opinion, though perhaps helpful in many ways, cannot be the sole basis to establish that [Rodriguez's] mental disorder played a significant role in the commission of the charged offense, especially when Dr. Cunanan is noticeabl[y] silent on the issue."

The district attorney argued the social worker failed to ask Rodriguez about what happened on the day of his arrest, and thus had no basis for her opinion that a mental disorder played a significant role in the commission of the charged offenses. Rodriguez also had prior violent felonies that could not be excused by Alzheimer's dementia, and the district attorney asserted he was panhandling on the day of his arrest and got caught. "After all, no one can know what was going on in [Rodriguez's] head, perhaps the Court least of all …."

### EVIDENTIARY HEARING ON DIVERSION MOTION

On September 20, 2019, the court conducted an evidentiary hearing on Rodriguez's motion for pretrial diversion.

**Ms. Alves-McAuley's Testimony on Voir Dire**

Ms. Alves-McAuley was called by Rodriguez and was the only witness; both parties conducted voir dire as to whether she was an expert. She had a bachelor's degree in psychology and a master's degree in social work, worked in social services for about

---

[10] Dr. Cunanan's letter, stating that Rodriguez was diagnosed with Alzheimer's dementia, was dated two months before his arrest in this case.

12 years, and had been an LCSW for two years. She had been trained about disorders listed within the DSM-5. While she was not a medical doctor, her training involved reviewing information from physicians to conduct patient assessments.

Ms. Alves-McAuley testified that while an Alzheimer's diagnosis required MRIs and medical testing, Alzheimer's disease was listed in the DSM-5 as a mental disorder and defined as a "major neurocognitive disorder due to Alzheimer's disease."

**The District Attorney's Objections**

After voir dire, the district attorney objected to Ms. Alves-McAuley testifying as an expert because Rodriguez's diversion motion was based on the claim that he had Alzheimer's disease; Alzheimer's disease was a medical diagnosis and not a mental health condition; Ms. Alves-McAuley's expertise "[was] not in that medical field;" and she was not qualified to testify as an expert in this case since she was not a medical doctor.

The district attorney "definitely agree[d]" Ms. Alves-McAuley had "a lot of training," but argued she could not qualify as an expert in this case because "Alzheimer's disease is a medical disorder, and the substance of the moving paper[s] in this matter is that [Rodriguez] has been diagnosed with Alzheimer's disease.Ms. Alves-McAuley's expertise is not in that medical field."

The district attorney asserted the social worker did not have "specific training" about Alzheimer's disease but only had "some related experience in a related disorder in the DSM-5 … which is a neurocognitive disorder that could be caused by Alzheimer's or other dementia-related disorders, but that is a separate diagnosis from Alzheimer's. So accordingly, I don't think that this is a properly qualified expert in the given case."

**The Court Overrules the District Attorney's Objections**

The court stated Ms. Alves-McAuley was called as an expert to testify whether Rodriguez suffered from Alzheimer's disease, she could testify as an expert, and any lack of specific expertise on the topic would go to the weight and not the admissibility of her

15

testimony.  The court noted she was not being called as an expert to give her own diagnosis of Alzheimer's dementia, and the district attorney could object to her testimony if she lacked expertise on the topic.

As Ms. Alves-McAuley started to testify about her review of Rodriguez's medical records, the district attorney immediately objected and claimed such testimony constituted inadmissible hearsay.  The court overruled the objection and held the formal rules of evidence did not apply at a diversion hearing, the court could consider hearsay evidence, and Ms. Alves-McAuley could rely on reports from other experts.

The district attorney lodged a continuing hearsay objection to all aspects of Ms. Alves-McAuley's testimony and argued section 1001.36 did not eliminate the hearsay rules of evidence.

The court overruled the district attorney's evidentiary objections because the entirety of the diversion statute "contemplates reliable hearsay being admissible in these hearings."  It found section 1001.36, subdivision (b) permitted introduction of a broad range of "relevant and credible evidence," including medical records, records or reports by qualified medical experts, or evidence the Rodriguez displayed symptoms consistent with the relevant medical disorder at or near the time of the offense, and subdivision (c)(3) further stated the diversion hearing "shall be informal" and that "reliable hearsay" may be introduced.[11]

---

[11] The court correctly overruled the district attorney's evidentiary objections.  "A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing *any relevant and credible evidence, including, but not limited to*, police reports, preliminary hearing transcripts, witness statements, *statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts*, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense."  (§ 1001.36, subd. (b)(1)(B), italics added.)  "The hearing on the prima facie showing *shall be*

The district attorney again objected to Ms. Alves-McAuley's testimony because Rodriguez's motion for diversion was based on the allegation that he suffered from Alzheimer's disease, that was a medical diagnosis, and she was not qualified to testify as an expert about the medical diagnosis that Rodriguez's motion was relying on:

> "And, Your Honor, given that [Ms. Alves-McAuley] does not have the expertise in Alzheimer's – *it would be a doctor – and given that Alzheimer's in and of itself is not specifically in the DSM-5, but a related product of impairment disorder*, is my understanding, her reviewing of reports showing the defendant's diagnosis can, in fact, inform her opinion as to his potential diagnosis in the DSM-5 which is within her field of expertise, but the evidence elicited through the People in the hearsay statement, that she is relying on a diagnosis from a doctor who is not present in this court, who is reporting that the defendant has Alzheimer's, is a lack of foundation because she does not have expertise in Alzheimer's, but also is hearsay because that is an out-of-court declarant." (Italics added.)

The court asked Ms. Alves-McAuley if she was licensed to make diagnoses as an LCSW. She said yes and explained Alzheimer's disease is listed as a mental disorder in the DSM-5, and the latest edition gave Alzheimer's a different name because the manual was "constantly changing names of things, but it is the same diagnosis."

The court overruled the district attorney's objections, and stated it had "looked at DSM-5 and Alzheimer's is definitely among the diagnoses …."[12]

---

*informal* and may proceed on offers of proof, *reliable hearsay*, and argument of counsel…." (§ 1001.36, subd. (b)(3), italics added.)

[12] The district attorney's repeated assertions that Alzheimer's disease was not in DSM-5 were incorrect.

The fourth volume of the DSM (DSM-IV) listed "dementia as among mental disorders that include cognitive deficits resulting from (among other causes) 'the combined effects of cerebrovascular disease and Alzheimer's disease.' " (*County of Los Angeles v. Superior Court* (2013) 222 Cal.App.4th 434, 448, fn. omitted.) " 'The disorders in the 'Dementia' section [of DSM-IV] are characterized by the development of multiple cognitive deficits (including memory impairment) that are due to the direct physiological effects of a general medical condition, to the persisting effects of a

17

**Ms. Alves-McAuley's Testimony**

Ms. Alves-McAuley testified that in approximately 2015, Dr. Cunanan, Rodriguez's primary care physician, diagnosed him with Alzheimer's disease, a mental illness identified in the DSM-5. Rodriguez's adult daughter saw symptoms about four years before he was arrested in this case.

In Ms. Alves-McAuley's opinion, Rodriguez also met the criteria in the DSM-5 for alcohol use disorder and sustained remission based on his multiple prior arrests for public intoxication, and his family's disclosure that he had an alcohol problem. His family knew Rodriguez stopped drinking in April 2017, because they were watching him. However, Rodriguez would get confused and forget that he was not drinking anymore, and he would repeatedly tell his family that he had a hangover and wanted to drink again.

After Rodriguez had been in custody for three weeks in this case, the probation officer interviewed him and Rodriguez again insisted that he had a hangover, even though he had not been drinking. The probation officer also reported Rodriguez had difficulty comprehending questions and his answers were nonsensical.

Ms. Alves-McAuley testified that Rodriguez wandered away from his home on the day of his arrest in this case, because his family did not realize how closely they had to watch him. Ms. Alves-McAuley testified the DSM-5 listed wandering, combative

---

substance, or to multiple etiologies (e.g., the combined effects of cerebrovascular disease and Alzheimer's disease).' [Citation.]" (*Id.* at p. 448, fn. 11.)

At the diversion hearing in this case, the trial court expressly relied on the fifth edition of the DSM, published in 2013. DSM-5 stated the disorders previously described in the fourth edition as " 'Dementia, Delirium, Amnestic, and Other Cognitive Disorders' " had been reclassified as "neurocognitive disorders (NCDs)," and "[t]he major or mild NCD subtypes" included "*NCD due to Alzheimer's disease*." (DSM-5 at p. 521, italics added.) "Dementia is subsumed under the newly named entity *major neurocognitive disorder* …." (DSM-5 at p. 521.) "Major NCD corresponds to the condition referred to in DSM-IV as *dementia*, retained as an alternative in this volume." (DSM-5 at p. 536.)

behavior, and physically aggressive behavior as characteristics of Alzheimer's dementia and neurocognitive disorder.[13]

When his family realized Rodriguez walked away from the house, they looked for him, called hospitals and police, and were very worried because they could not find him.

Rodriguez was now at home, and his daughter reported his behavior appeared to be well controlled with his current medications, and he no longer wandered away. His physical health was declining, and he needed more assistance from his family to perform the activities of daily living.

*Cross-examination*

Ms. Alves-McAuley testified she interviewed Rodriguez on April 8, 2019. He responded to questions about his early life but could not remember recent events. She explained that Rodriguez's ability to remember the distant past, but not the present, was consistent with someone suffering from a neurocognitive disorder.

The district attorney asked whether Alzheimer's and related cognitive disorders are also medical conditions. Ms. Alves-McAuley testified that in contrast to many mental disorders in the DSM-5, there was a medical basis for Alzheimer's if an MRI is performed. Rodriguez's physician ordered an MRI and reported that it was consistent with dementia.[14]

---

[13] "[A]pproximately 80% of individuals with major NCD due to Alzheimer's disease have behavioral and psychological manifestations; these features are also frequent at the mild NCD stage of impairment…. With moderately severe major NCD, psychotic features, irritability, *agitation, combativeness, and wandering are common*. Late in the illness, gait disturbance, dysphagia, incontinence, myoclonus, and seizures are observed." (DSM-5 at pp. 540–541, italics added.) "*Agitation* is common in a wide variety of NCDs, particularly in major NCD of moderate to severe severity, and often occurs in the setting of confusion or frustration. *It may arise as combative behaviors*, particularly in the context of resisting caregiving duties such as bathing and dressing…." (DSM-5 at p. 535, italics added.)

[14] "The NCDs are unique among DSM-5 categories in that these are syndromes for which the underlying pathology, and frequently the etiology as well, can potentially be determined. The various underlying disease entities have all been the subject of

The district attorney asked whether Alzheimer's and dementia were different disorders. Ms. Alves-McAuley testified Alzheimer's was a specific form of dementia, and the DSM-5 broadly defined categories of neurocognitive disorders to include Alzheimer's disease and other brain injuries.

Ms. Alves-McAuley acknowledged she was not a doctor and could not make a medical diagnosis, but she could make a diagnosis of neurocognitive disorder under the DSM-5 based on Rodriguez's medical records and history of his behavior.

The district attorney asked whether the DSM-5 stated that Alzheimer's dementia was a progressively worsening disorder. Ms. Alves-McAuley said it was incurable and progressively became worse.

**The Court's Questions**

The court noted that Corizon's mental health assessment of Rodriguez was performed in jail on November 17, 2017, shortly after his arrest, and that it "points out a lot of the disorientation and lack of ability to understand what's going on," and gave a diagnosis of bipolar disorder.

The court asked Ms. Alves-McAuley how to determine whether Rodriguez's mental disorder played a significant role in the commission of the instant offenses, or if he was just drunk, obnoxious, and violent, given his numerous prior arrests for public intoxication. Ms. Alves-McAuley testified that "you can't see into anybody's mind," but noted that when Rodriguez was in custody, the probation officer had reported that he had difficulty comprehending questions. Rodriguez's physician had already diagnosed him with dementia prior to his arrest in this case, and his daughter said his symptoms existed when he was still working in the fields and could not comprehend his assignments. Ms.

---

extensive research, clinical experience, and expert consensus on diagnostic criteria." (DSM-5 at p. 521.)

Alves-McAuley believed his confusion, memory issues, and wandering away from home could be due to his mental disorder.[15]

**The Parties' Arguments**

After hearing Ms. Alves-McAuley's testimony, the court invited the parties to argue the merits of the diversion motion.

### *Rodriguez's Arguments*

Rodriguez's attorney argued the evidence established the criteria set forth in section 1001.36 for pretrial diversion because Alzheimer's disease was a diagnosis in the DSM-5, even though the nomenclature had changed in the current edition, and Rodriguez had other qualifying diagnoses of alcoholism in remission and bipolar disorder. The mental disorder played a significant role in the commission of the charged offenses and his conduct was consistent with that disorder – he wandered away from home and got into a physical altercation, which were "literally" textbook symptoms of Alzheimer's disease. Rodriguez's behavior was inconsistent with his prior arrests for public intoxication, and his previous violent behavior was separated by quite a bit of time from the instant case.

Counsel stated since Rodriguez had been released from custody, his symptoms responded to medication and treatment from his physicians, and he had not consumed alcohol or been involved in any disruptive behavior.

### *The District Attorney's Arguments*

The district attorney argued Rodriguez failed to prove his alleged mental disorder was a significant factor in committing the charged offenses, because even the defense motion stated that "no one can know what was going on inside the defendant's head

---

**15** "*Agitation* is common in a wide variety of NCDs, particularly in major NCD of moderate to severe severity, and often occurs in the setting of confusion or frustration. *It may arise as combative behaviors*, particularly in the context of resisting caregiving duties such as bathing and dressing.…" (DSM-5 at p. 535, italics added.)

when he committed the crime in question."  The district attorney asserted, "[W]hat we do know is that the history of [his] drug intoxication goes back literally for decades," and was the more likely reason for his conduct.

The district attorney again claimed Alzheimer's disease was not listed in the DSM-5:

> "[THE DISTRICT ATTORNEY]: "[T]he medical symptoms of Alzheimer's and/or dementia, which are two different things medically, I might add, require different diagnoses altogether, and some are diagnosed different ways than others.  The medical diagnoses of dementia or Alzheimer's are different from the DSM-5 diagnosis.
>
> "THE COURT:        Where does that come from?
>
> "[THE DISTRICT ATTORNEY]: Alzheimer's is a medical disease.
>
> "THE COURT: *It's also a mental health disease as outlined in the DSM-5.*
>
> "[THE DISTRICT ATTORNEY]: *I understand that*, but we have no evidence showing that what makes it a mental health disease outlined in the DSM-5 are the same exact requirements that –
>
> "THE COURT: It's the same disease. I'm not understanding your argument.
>
> "[THE DISTRICT ATTORNEY]: What is in the DSM-5, according to the expert, is a neurocognitive impairment.
>
> "THE COURT:        And that is Alzheimer's as well."[16]  (Italics added.)

Next, the district attorney argued that Rodriguez's alleged mental disorder was not subject to pretrial diversion because "Alzheimer's does not have a great prognosis, it is a significantly worsening disease that only declines.  So while it may respond to

---

[16] Again, the district attorney's renewed arguments on this point were meritless because the fifth edition of the DSM clearly identified Alzheimer's disease as a neurocognitive disorder and clarified that only the chapter heading and classification had changed.  (DSM-5 at p. 541.)

management, I don't know that management of Alzheimer's and related dementia disorders and diseases is within the legislature's contemplation of treatment within 1001.36" since it was incurable.

The court replied that diversion would be appropriate for a mental illness, even if incurable, if the subject could respond to treatment.[17] The district attorney insisted that Alzheimer's was not "receptive to treatment," the proposed treatment plan was insufficient to ensure public safety and pointed out that Rodriguez had prior convictions for battery and domestic violence that could not be blamed on Alzheimer's disease or alcohol.

## THE COURT'S RULING

The court stated it had taken judicial notice of Rodriguez's records, including the preliminary hearing, the medical reports that Rodriguez was diagnosed with Alzheimer's disease, the pretrial reports from the probation department and Corizon, and considered the parties' motions and arguments.

The court stated it was going to grant the motion for diversion, and made the following findings:

> "[Rodriguez] suffers from a mental disorder that has been identified in the most recent edition of the DSM-5, and that would include the neurocognitive brain disorder. That is that he's been diagnosed with Alzheimer's. The Court has little doubt that he was suffering from that at the time.
>
> "In addition, there is even a more recent diagnosis from Corizon, at the order of the Court, by a licensed therapist, indicating that they opine that his symptomology right after this offense was consistent with bipolar disorder. *Either one of those diagnoses is sufficient under the statute to indicate that the defendant was suffering from a mental disease or disorder*

---

[17] "Major or mild NCD due to Alzheimer's disease *progresses gradually*, sometimes with brief plateaus, through severe dementia to death. The mean duration after diagnosis is approximately 10 years …. Late-stage individuals are eventually mute and bedbound." (DSM-5 at p. 541, italics added.)

23

*under the – a mental disorder, I should say, as defined under the statute*." (Italics added.)

The court acknowledged Rodriguez had a long history of prior arrests for public intoxication and "a serious, serious, chronic problem with alcohol abuse." While Rodriguez also had prior convictions for battery and domestic violence, the court found those convictions occurred in 1984, 1998, and 2002, and his more recent offenses were alcohol-related and not violent.

> "So the question is not whether the mental disorder caused the defendant to act in a particular way. The statute talks about whether or not the disorder played a significant role in the commission of the offense…. [¶] The issue is confused some because of the significant history of alcohol abuse, and the fact that essentially [Rodriguez] had fallen off the wagon and was drinking at the time of the offense. It is difficult for the Court to say, given the defendant's history with being publicly intoxicated dozens of times and never having exhibited any violent behavior in the last 20 years or more. *The Court has a difficult time saying that the mental disease that he is suffering from did not contribute significantly to the incident that he was involved in.* I know that's a little backwards and a little convoluted. And the People are quite correct, and the expert testimony that we had is completely correct, and the defense is completely correct. *No one can get inside the defendant's head. That can be said of any defendant, of any human being.* It could be said of me, of you, of anybody. It's impossible to know that, and so the best the Court can do is, looking at all of the evidence, determine whether or not it appears that –- and if you were to – if the Court were to opine a but-for test, which is, I think, more stringent than the substantial factor analysis, the Court would come to the conclusion that *but for the mental illness, this offense would have been very unlikely to have occurred, and that's based on the evidence, on the police reports, and on his conduct immediately after the offense, including the way that he behaved with probation at the time of the pre-trial release report, as well as his participation in the Corizon report….*" (Italics added.)

The court cited the Corizon report because the evaluation was conducted shortly after Rodriguez's arrest, when he was in jail and did not have access to alcohol. The Corizon report showed that Rodriguez "was suffering from a significant mental illness even then, and that's sort of been unabated in the current recent time period."

The court concluded that while it was not "clear-cut," it found "on balance … that the mental disorder substantially contributed to [Rodriguez's] … commission of the offense.  It again does not need to be exclusive, just substantially contributed.  And the incident was bizarre enough and out of character enough that the Court is satisfied with that."

The court next found that the symptoms motivating the criminal behavior would respond to mental health treatment because "the proof is in the pudding," since Rodriguez was already receiving treatment and medication, and he would not pose an unreasonable risk of danger to public safety since he had not reoffended while on community release for the past two years.

The court stated that it was inclined to grant the motion but continued the matter for further consideration of whether Rodriguez could waive his rights to be placed on diversion given his mental condition, he could knowingly and voluntarily consent to the treatment plan, and for preparation of a more specific treatment plan.

Rodriguez's attorney asked whether the court would be satisfied if Rodriguez's physician monitored and reported his condition.  The court said that would be acceptable.

**The Court's Diversion Order and Approval of Treatment Plan**

On October 4, 2019, the court conducted the continued hearing about the proposed treatment plan.  Rodriguez's attorney stated that he submitted a plan where Dr. Cunanan, his primary care physician, would be the reporting party and submit status reports that outlined Rodriguez's compliance after every visit.

The district attorney again objected to placing Rodriguez on mental health diversion because he was diagnosed with dementia, and that "is not something that can be controlled or recovered by medication.  He will continue to degenerate down into the point of eventually whatever should happen at the end of life stages of dementia.  [He] is not a candidate for mental health diversion due to the diagnosis.  *I understand it's in the DSM-5,* but the goal of mental health diversion is to get them on medication that will get

them back into society, how to be safe, and return them to what they are supposed to be doing. Dementia doesn't meet that criteria."[18]  (Italics added.)

The court replied that it already found dementia was a qualifying diagnosis in the DSM-5 and was satisfied there was sufficient specificity in the treatment plan to have Rodriguez's physician monitor and report on his status and compliance. In response to the court's questions, Rodriguez stated he was willing to follow the treatment plan and waived his right to a speedy trial.

The court granted Rodriguez's motion for pretrial diversion pursuant to section 1001.36, adopted the plan that Dr. Cunanan would supervise Rodriguez's treatment and provide regular status reports, and set a review hearing.

**The People's Appeal**

On November 6, 2019, the People, represented by the district attorney's office, filed the instant notice of appeal of the trial court's order of October 4, 2019, that granted Rodriguez's motion for diversion (case No. F080268).

As explained above, the district attorney opposed Rodriguez's diversion motion and asserted that Alzheimer's dementia was a "medical" diagnosis and not a mental disorder, it was not listed in the DSM-5 as a mental disorder, Ms. Alves-McCauly was an LCSW and not qualified to testify as an expert about a "medical" diagnosis, she could not rely on the reports from Rodriguez's physicians, and Alzheimer's dementia could not be

---

**18** While the deputy district attorney ultimately conceded that Alzheimer's dementia was identified as a mental disorder in DSM-5, she continued to argue that it was not the type of mental disorder that could be the basis for a diversion order. This argument was meritless and inconsistent with section 1001.36, subdivision (b)(1)(A), that "defines a qualifying mental disorder as one that is 'identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but *excluding antisocial personality disorder, borderline personality disorder, and pedophilia.*' " (*Moine, supra*, 62 Cal.App.5th at p. 449, italics added.) The statute does not exclude Alzheimer's disease and/or dementia from being a qualifying mental disorder for purposes of diversion.

26

the subject of a diversion motion because it was incurable.  The trial court overruled these objections

On appeal, the People of the State of California, as appellant and represented by the district attorney, have not renewed the same objections that were raised at the diversion hearing.  Instead, the People raise an argument for the first time that was not raised at the diversion hearing – that only a psychiatrist or a licensed psychologist may testify as a "qualified mental health expert" under section 1001.36, and that a social worker or LCSW can never testify in support of any motion for diversion, regardless of the mental disorder that is the basis for the motion.  The People conceded in its reply brief and at oral argument that it did not raise this same issue at the diversion hearing, but assert this court must still address the new issue raised for the first time on appeal because it presents a question of law.

## DISCUSSION

## I.   The People Have the Statutory Right to Appeal the Trial Court's Order

In response to this court's request for supplemental briefing, the parties disagree as to whether the People had a statutory right to file the instant appeal from the trial court's order that granted Rodriguez's motion for pretrial diversion on October 4, 2019.

The People argue they have the right to an appeal based on section 1238, subdivision (a)(1), *People v. Wright* (1975) 47 Cal.App.3d 490 (*Wright*), and a series of cases.[19]

Rodriguez asserts the instant appeal must be dismissed because the People do not have a statutory right to appeal under section 1238 and disputes the People's reliance on the cases cited in its briefing.

---

[19] Given that there are two cases with the same name that address this issue, all further citations to "*Wright*" are to *People v. Wright, supra*, 47 Cal.App.3d 490.

**A.    *Section 1238***

"The prosecution's right to appeal in a criminal case is strictly limited by statute. [Citation.]  Long-standing authority requires adherence to these limits even though 'the People may thereby suffer a wrong without a remedy.'  [Citation.]  The circumstances allowing a People's appeal are enumerated in section 1238." (*People v. Chacon* (2007) 40 Cal.4th 558, 564.)

As relevant to this case, "[u]nder section 1238, subdivision (a)(1), the People are entitled to appeal '[a]n order setting aside all or any portion of the indictment, information, or complaint.'  In determining whether a specific order is appealable under this section, courts consider the form, substance and effect of the order.  [Citations.]  While an order may not be specifically listed as an appealable order under section 1238, if the substance of the order *has the purpose and ultimate effect* of setting aside all or any portion of the indictment, information, or complaint, then the order is appealable under section 1238, subdivision (a)(1).  [Citations.]"  (*People v. McClaurin* (2006) 137 Cal.App.4th 241, 247 (*McClaurin*), italics added.)

As noted above, the People assert they has the right to file the appeal in the instant case based on section 1238, subdivision (a)(1), *People v. Wright, supra,* 47 Cal.App.3d 490), and a series of cases that have cited to it.  Rodriguez asserts that the People's appeal must be dismissed because *Wright* did not cite to section 1238, and the People have relied on cases that do not support its right to an appeal in this case.

While the People have cited to additional cases that have relied on *Wright, supra*, 47 Cal.App.3d 490, these cases have done so either without further analysis, reference to section 1238, or for issues not related to the People's right to an appeal.  (See, e.g., *People v. Mazurette* (2001) 24 Cal.4th 789, 791, 797 [defendant's motion for diversion granted after her suppression motion was denied, and then she filed an appeal under section 1237 from the trial court's denial of suppression motion; court acknowledged *Wright* but held it was of "no assistance to defendant" since the defendant's right to

28

appeal was based on section 1237 and not section 1238; *People v. Alonzo* (1989) 210 Cal.App.3d 466, 468–470 [follows *Wright* without analysis or citation to section 1238, that the People could file an appeal from an order granting drug diversion, and reversing order because the defendant was not eligible since he was charged with a disqualifying drug offense]; *People v. Wright* (2002) 99 Cal.App.4th 201, 204 [following *Wright* without analysis or citation to section 1238, finding the People could file an appeal from a drug diversion order].)

The concurring and dissenting opinion states that in both the notice of appeal and briefing, the People failed to state a statutory basis for the instant appeal and only cited to *Wright* and these other cases and argue that "[i]t was not until their supplemental brief that the People finally contended their appeal was authorized under section 1238, subdivision (a)(1) and (a)(8)." (Conc. & dis. opn., *post*, at p. 2.)

A notice of appeal must be "liberally construed." (Cal. Rules of Court, Rule 8.100 (a)(4).) An appellant's opening brief must state, among other things, "that the judgment appealed from is final, or explain why the order appealed from is appealable." (Cal. Rules of Court, rule 8.204(a)(2)(B).) The People complied with this rule and included a short statement of appealability in their opening brief that cited to *Wright* and these other cases, and further stated that "[a]n order granting pretrial diversion is thus appealable by the People. [Citations.]" The People's citations to *Wright* in both the notice of appeal and opening brief's statement of appealability were not unreasonable since the opinion has not been questioned or undermined for over 45 years.

As demonstrated by the concurring and dissenting opinion, however, there was some concern as to whether the People had a statutory right to an appeal from the trial court's order in this case. Given the absence of a defense motion to dismiss the appeal on this ground, or defendant challenging appealability in any way, this court afforded the parties the opportunity to address this issue. (See, e.g., *People v. Alice* (2007) 41 Cal.4th 668, 674–680; Gov. Code, § 68081.)

29

As a result, this court requested supplemental briefing from the parties on the question of whether the People had the right to appeal the trial court's order in this case. In response, the parties extensively addressed the issue, and the People expressly relied on section 1238, subdivision (a)(1), *Wright*, and other authorities to argue the instant appeal was statutorily authorized and, as we will address below, we agree with this argument.

We thus turn to section 1238, *Wright,* and other authorities to determine whether the People could file the appeal in this case.

**B.**    ***Wright***

*Wright* involved a People's appeal from a drug diversion order issued pursuant to section 1000 et seq., statutory provisions that authorize a trial court to grant a motion for drug diversion "whenever a case is before any court upon an accusatory pleading" if the defendant was charged with committing certain enumerated offenses, and other circumstances.  (§ 1000, subd. (a); *Wright, supra*, 47 Cal.App.3d at p. 493; *Morse v. Municipal Court* (1974) 13 Cal.3d 149, 156–160.)

In *Wright, supra,* 47 Cal.App.3d 490, the defendant was charged with offenses that did not qualify him for drug diversion under section 1000 et seq., the same statutes addressed in *Morse*.  After a bench trial, he was acquitted of the nonqualifying offenses, and convicted of a lesser included offense that was in the enumerated list of qualifying offenses.  After he was convicted, he requested diversion under section 1000 et seq., and argued he was now eligible since he suffered a qualifying conviction.  The trial court granted his diversion motion over the People's objections.  The People filed both a notice of appeal and a petition for writ of mandate and argued the trial court lacked statutory jurisdiction under section 1000 et seq. to grant the defendant's motion for drug diversion after he was convicted.  (*Wright*, *supra*, 47 Cal.App.3d at p. 492.)

*Wright* first held the People could file an appeal from the trial court's drug diversion order that was issued pursuant to section 1000 et seq.:

30

"We must first decide whether there is in existence an appealable order. We hold that the order granting diversion is analogous to a final judgment in a 'special proceeding' (*People* v. *Murphy*, 70 Cal.2d 109, 115 [74 Cal.Rptr. 65, 448 P.2d 945]), and hence *is final for the purposes of appellate review.* '... It is not the form of the decree but the substance and effect of the adjudication which is determinative. As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that *where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final*, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory.' [Citation.] *Hence the order granting diversion is an appealable order.*" (*Wright*, *supra*, 47 Cal.App.3d at pp. 492–493, italics added.)

*Wright* turned to the merits and agreed with the People that the trial court's order for drug diversion after the defendant was convicted was not authorized under section 1000 et seq.

"The second question presented is whether the superior court acted beyond its jurisdiction in diverting the defendant after his trial and conviction. Defendant was diverted pursuant to … section 1000 after his trial and conviction. As stated in *People v. Reed*, 46 Cal.App.3d 625, 629 [120 Cal.Rptr. 250]: 'Since acceptance of this case by the Supreme Court, that court has rendered its opinion in *Morse v. Municipal Court*, 13 Cal.3d 149 [118 Cal.Rptr. 14, 529 P.2d 46]. The issue raised relative to the court's authority to divert defendant *after* the completion of a criminal trial has been determined adversely to defendant's position." (*Wright*, *supra*, 47 Cal.App.3d at p. 493, fn. omitted.)

*Wright* acknowledged *Morse's* analysis of the drug diversion statutes, and rejected the defendant's arguments that he became eligible after he was convicted of a qualifying offense:

"[S]ection 1000 states in pertinent part that 'whenever a case is before any court upon an *accusatory pleading*' (italics added) and certain prerequisites are made, the defendant can be diverted. In the case at bench defendant was not eligible for diversion prior to trial, and *the Penal Code does not make provision for diversions after trial.* Furthermore, in light of *Reed, supra*, and *Morse, supra*, defendant cannot be diverted after trial in any event." (*Wright*, *supra*, 47 Cal.App.3d at p. 494, second italics added.)

31

*Wright* reversed the trial court's order that granted diversion and dismissed the People's writ petition as moot since it found the People's appeal was appropriate. (*Wright*, *supra*, 47 Cal.App.3d at p. 494.)

## C.   *Analysis*

In the supplemental briefing in this case, the People argued *Wright* effectively held the trial court's grant of postconviction diversion in that case "was a final and appealable order" within the meaning of section 1238, subdivision (a)(1), since that subdivision permits a People's appeal from "[a]n order setting aside all or any portion of the indictment, information, or complaint."

We agree the People have a statutory right under section 1238 to appeal the trial court's pretrial diversion order in this case. We also agree that *Wright* supports such a conclusion. As noted above, section 1238, subdivision (a)(1) states the People may take an appeal from "[a]n order setting aside all or any portion of the indictment, information, or complaint." *Wright's* holding focused on the impact of an order issued pursuant to the express provisions of section 1000 et seq. – that the trial court's order would eventually result in the dismissal of all charges against the defendant if he successfully completed drug diversion. There was " 'no issue … left for future consideration except the fact of compliance or noncompliance,' " which meant that order was final for purposes of the People filing an appeal. (*Wright*, *supra*, 47 Cal.App.3d at pp. 492–493.)

While *Wright* did not expressly cite to section 1238, its holding on appealability impliedly pointed to subdivision (a)(1) as the statutory basis for its conclusion that the People had the right to file an appeal of a diversion order issued under section 1000 et seq. "While an order may not be specifically listed as an appealable order under section 1238, if the substance of the order *has the purpose and ultimate effect* of setting aside all or any portion of the indictment, information, or complaint, then the order is appealable under section 1238, subdivision (a)(1). [Citations.]" (*McClaurin, supra,* 137 Cal.App.4th at p. 247, italics added.)

Section 1238, subdivision (a)(1), and the analysis in *Wright*, clearly apply to the People's appeal in this case.  As with drug diversion, section 1001.36, subdivision (c) similarly defines pretrial mental health diversion as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment …."  Section 1001.36, subdivision (c)(3) further states:  "The period during which criminal proceedings against the defendant may be diverted shall be no longer than two years."  If the defendant performs satisfactorily in mental health diversion and does not reoffend, "at the end of the period of diversion, the court *shall dismiss* the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion…."  (§ 1001.36, subd. (e), italics added.)

As in *Wright*, once the trial court places a defendant on pretrial mental health diversion, there is no issue left for future consideration " 'except the fact of compliance or noncompliance with the terms of the first decree,' " and, as a result, " 'that decree is final' " for purposes of the People's ability to file an appeal.  (*Wright*, *supra*, 47 Cal.App.3d at pp. 492–493.)  A trial court's order that places a defendant on mental health diversion under section 1001.36 starts a process that addressed in section 1238, subdivision (a)(1), because it "has the purpose and *ultimate effect* of setting aside all or any portion of the indictment, information, or complaint ….  [Citations.]"  (*McClaurin, supra,* 137 Cal.App.4th at p. 247, italics added.)

Thus, while *Wright* did not expressly rely on section 1238, subdivision (a)(1), the holding is consistent with that statutory provision as the basis for the People's appeal.  In this case, as in *Wright*, the People had the statutory right under subdivision (a)(1) to file an appeal from the trial court's order that granted Rodriguez motion for pretrial mental health diversion since the diversion order would have the purpose and ultimate effect of setting aside the felony charges in the information.

While the concurring and dissenting opinion takes exception to the People's arguments on several points, it is important to note that under either the majority or concurring and dissenting opinion, the trial court's order will be affirmed by this court. In any event, the concurring and dissenting opinion first asserts the People failed to state a statutory basis for this appeal and only relied on case authority. (Conc. & dis. opn., *post*, at pp. 1–2.) As previously noted, however, the People's supplemental brief, filed at this court's request, expressly cited to section 1238, subdivision (a)(1) as providing the statutory basis for this appeal.

Next, the concurring and dissenting opinion cites "the fundamental axiom" that the People's right to an appeal in a criminal case is strictly limited by statute (conc. & dis. opn., *post*, at p. 11), and asserts "[i]t is within the Legislature's province to define the People's appellate rights. If the Legislature wanted to allow the People to appeal an order granting pretrial mental health diversion, it could easily have added that order to the list of appealable orders in section 1238, subdivision (a). The Legislature did not do that, and it is an unwarranted invasion of the Legislature's province for this court to allow the People to appeal from this order." (Conc. & dis. opn., *post*, at pp. 5–6.)

It is well-settled that "the courts are precluded from so interpreting section 1238 as to expand the People's right of appeal into areas other than those clearly specified by the Legislature." (*People v. Gaines* (1980) 112 Cal.App.3d 508, 512; *People v. McGuire* (1993) 14 Cal.App.4th 687, 700–701.) While the application of section 1238 is subject to this limitation, many courts have interpreted section 1238 to find a People's appeal falls within the intent of the statute, based on the circumstances in those particular cases. (See, e.g., *People v. Superior Court (Vidal)* (2007) 40 Cal.4th 999, 1003, 1009–1011 [section 1238, subdivision (a)(8), that permits appeal of an order "terminating … any portion of an action … before the defendant has been placed in jeopardy," interpreted to "reasonably include" the People's appeal of pretrial ruling as to the penalty phase of a capital trial]; *People v. Chacon*, *supra*, 40 Cal.4th at pp. 561, 563–565; [the People's

appeal of court's in limine ruling resulting in dismissal of action was permitted under section 1238, subdivision (a)(8)]; *People v. VonWahlde* (2016) 3 Cal.App.5th 1187, 1194 [section 1238, subdivision (a)(5), that permits appeal of an order " 'made after judgment, affecting the substantial rights of the people,' " interpreted to include the trial court's order terminating parole]; *McClaurin, supra*, 137 Cal.App.4th at pp. 246–248 [trial court order compelling specific performance of a plea agreement, resulting in dismissing of pending charges, was appealable under section 1238, subdivision (a)(1); *People v. McGuire*, *supra*, 14 Cal.App.4th at pp. 700–701 and cases cited therein [People's appeal of pretrial order for bail was properly filed under section 1238, subdivision (a)(5) because ruling affected " 'the substantial rights of the people' "].)

The concurring and dissenting opinion asserts *Wright* was incorrectly decided because it held that "granting diversion is analogous to a final judgment in a 'special proceeding' (*People* v. *Murphy*, *supra*, 70 Cal.2d at p. 115 [74 Cal.Rptr. 65, 448 P.2d 945]), and hence is final for the purposes of appellate review."  (*Wright*, *supra*, 47 Cal.App.3d at p. 492.)  The concurring opinion finds *Wright* improperly relied on *Murphy* for this conclusion because *Murphy* addressed a civil commitment order under Welfare and Institutions Code section 3051, that was appealable under former provisions of the Code of Civil Procedure since it was a " 'special proceeding,' " *Murphy* involved a vastly different statutory procedure (since repealed) than presented in *Wright* and the instant case, and *Murphy* addressed an appeal filed by the defendant and not the People. (Conc. & dis. opn., *post*, at pp. 7–10.)

*Wright's* discussion of *Murphy* was not the result of confusion between a criminal and civil commitment.  Instead, it simply analogized the import of the commitment to the "final" nature of a "special proceeding" in evaluating appealability.  This comparison led to *Wright's* holding that " '[i]t is not the form of the decree but the substance and effect of the adjudication which is determinative.  As a general test, *which must be adapted to the particular circumstances of the individual case*, it may be said that where no issue is

35

left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory.' [Citation.] Hence the order granting diversion is an appealable order." (*Wright, supra*, 47 Cal.App.3d at pp. 492–493, italics added.)

*Wright's* analogy to the special proceeding in *Murphy* was not critical to *Wright's* conclusion that the People could file an appeal from the trial court's drug diversion order. Instead, the focus of *Wright's* holding was on the *express provisions* of section 1000 et seq. – that the trial court's diversion order in that case would eventually result in the dismissal of all charges against the defendant if he successfully completed drug diversion, and the nature of the trial court's order, " 'where no issue is left for future consideration except the fact of compliance or noncompliance,' " meant the trial court's order was final for purposes of the People filing an appeal. (*Wright*, *supra*, 47 Cal.App.3d at pp. 492–493.)

We reiterate that the People's appeal in this case was statutorily authorized by section 1238, subdivision (a)(1), completely independent of *Wright*, because the trial court's order, placing Rodriguez on diversion pursuant to section 1001.36, had the purpose and ultimate effect of setting aside the charges filed against him in the information upon compliance with the treatment plan. (*McClaurin, supra,* 137 Cal.App.4th at p. 247.)

As for *Wright*, that case did not hold that the People had a right to appeal from a *posttrial* diversion order, or from a statute that only authorized a court to issue a posttrial diversion order. The fact that the trial court's order in *Wright* was issued *after* the defendant was convicted was not the reason for finding the People could file an appeal in that case, or the basis for our conclusion that the instant appeal was authorized by section 1238, subdivision (a)(1).

Instead, *Wright* held the People could file an appeal to seek review of the trial court's order issued pursuant to section 1000 et seq. because " 'the substance and effect of the adjudication' " meant it was final since there was "*no issue … left for future consideration except the fact of compliance or noncompliance with the terms of the first decree ….*' " (*Wright*, *supra*, 47 Cal.App.3d at p. 492, italics added.)  As already explained, this is exactly the type of order contemplated by section 1238, subdivision (a)(1) since defendant's compliance with diversion would result in the dismissal of the charges in the information, both under the drug diversion statutes in *Wright* and the mental health diversion statutes at issue in this case.

After finding the People's appeal was valid, *Wright* turned to the substantive issue, and relied on the nature of the trial court's order being made *after* conviction as the reason it agreed with the People on the merits, that the trial court lacked statutory jurisdiction to issue the drug diversion order in that case under section 1000 et seq. (*Wright, supra*, 47 Cal.App.3d at pp. 493–494; *Morse, supra*, 13 Cal.3d at pp. 156–157.) The nature of the trial court's order was not the basis for *Wright's* finding that the People had the right to an appeal.

*McClaurin* illustrates the distinction between finding the People have a right to appeal an order pursuant to section 1238, and the substantive argument being raised in the People's appeal.  In *McClaurin*, the trial court granted the defendants' motion for specific performance of a plea agreement, and dismissed other charges over the prosecution's objections, because it found the prosecution improperly withdrew the plea offer after the defendants detrimentally relied on it to waive their preliminary hearing. (*McClaurin, supra*, 137 Cal.App.4th at pp. 245–246.)

*McClaurin* first held the People's appeal was properly filed based on section 1238, subdivision (a)(1), and the merits of the underlying substantive argument were a separate consideration from the People's right to an appeal:

"Here, when the court ordered specific performance, it dismissed all the pending charges against defendants and amended the complaint …. The order compelling specific performance thus had the effect of 'setting aside all or any portion of the … complaint.' (§ 1238, subd. (a)(1).) Accordingly, the People are entitled to appeal under section 1238, subdivision (a)(1).  [¶]  Defendants further contend that for policy reasons the People should not be allowed to appeal because to permit an appeal by the government under these circumstances would be to condone egregious governmental conduct.  This argument confuses the merits of the claim with the issue of whether the order is appealable.  Indeed, our conclusion thus far, that under the circumstances of this case the order is appealable by the People under section 1238, subdivision (a)(1) expresses no opinion as to the motivation behind the People's withdrawal of the plea offer." (*McClaurin, supra*, 137 Cal.App.4th at pp. 247–248, fn. omitted.)

*McClaurin* held the People could file the appeal under section 1238, independent of the underlying substantive question being raised.  As to the merits, *McClaurin* separately held there was insufficient evidence that defendants detrimentally relied on the plea offer and reversed the trial court's order for specific performance of the plea bargain. (*McClaurin, supra*, 137 Cal.App.4th at p. 250.)

The validity of a People's appeal under section 1238, and the substantive merits of the issues being raised on appeal, are thus two separate considerations.  The conclusions in *McClaurin* and *Wright* that the orders issued by the trial courts therein should be reversed, were not central to the preliminary determinations that the People could file appeals from those particular orders.  Moreover, while *McClaurin* was based on a different factual basis than the instant case, we agree with its analysis of both section 1238, subdivision (a)(1), and the conclusion that the question of appealability was separate from the merits of the People's substantive arguments.

We thus conclude that under section 1238, subdivision (a)(1), the People had the statutory right to file an appeal from the trial court's order that granted Rodriguez's motion for pretrial mental health diversion pursuant to section 1001.36, because that diversion order had "the purpose and ultimate effect" (*McClaurin, supra*, 137 Cal.App.4th at p. 247) of setting aside the felony charges in the information aside from

38

"the fact of compliance or noncompliance" with the diversion plan. (*Wright*, *supra*, 47 Cal.App.3d at pp. 492–493.)[20]

Aside from the question about whether such an appeal is permitted under section 1238, the concurring and dissenting opinion expresses concerns about potential procedural issues that could result if the People file an appeal from a trial court's diversion order, and whether defendant would suffer prejudice from a pending appeal. (Conc. & dis. opn., *post*, at p. 12.) *Wright* held the People could appeal from an order granting diversion and, while it did not expressly cite to section 1238, it appears that courts and parties have not experienced such problems since, as previously noted, *Wright* has not been disagreed with or even questioned for over 45 years.

There also are options available to avoid prejudice to defendant if the People file an appeal from the trial court's diversion order. The People could request the trial or appellate court to temporarily stay execution of the order granting diversion pending appeal (Cal. Rules of Court, rule 8.112), and defendant could request calendar preference

---

[20] The concurring and dissenting opinion suggests that a trial court's subsequent order that dismisses the charges and effectively sets aside the information "is the one that is arguably appealable under section 1238, subdivisions (a)(1) and (a)(8)." (Conc. & dis. opn., *post*, at p. 3.)

In supplemental briefing filed on another issue in this appeal, the People advised this court that it had filed a separate appeal in *People v. Rodriguez*, *supra*, F082715, that was pending before this court; Rodriguez successfully completed diversion while the instant appeal was pending and, in 2021, the trial court dismissed the charges filed against him.

The trial court's dismissal of the charges suggests the People did not request a stay of execution of the court's diversion order pending appeal at any time after the order was issued in 2019, nor did the parties request consolidation of the two appeals. We decline to address any issues that may be raised in *People v. Rodriguez*, *supra*, F082715. We note that it appears the notice of appeal, filed after the trial court dismissed the charges, may satisfy the concurring and dissenting opinion's concerns about the People's statutory right to appeal the trial court's diversion order and address the People's contentions on the merits.

from the appellate court (Cal. Rules of Court, rule 8.240). Such motions were not made in this case.

We further note that the concurring and dissenting opinion's conclusion that section 1238 prohibits the People from filing an appeal from the trial court's order granting diversion would restrict the People's ability to seek review of orders that amounted to a clear abuse of discretion. " 'If the prosecution has not been granted by statute a right to appeal, review of any alleged error may be sought by a petition for writ of mandate *only* when a trial court has acted in excess of its jurisdiction and the need for such review outweighs the risk of harassment of the accused. [Citations.]' [Citation.]" (*People v. Superior Court (Mitchell)* (2010) 184 Cal.App.4th 451, 456 (*Mitchell*).) "Some courts have taken an expansive view of the phrase 'excess of jurisdiction,' holding that where the law allows a court to act in only one way, the court exceeds its jurisdiction by doing anything else and the error can be corrected through writ review. [Citations.] Other courts have taken a restrictive stance, holding that there is no basis for writ review unless the trial court acts without subject matter or personal jurisdiction. [Citations.]" (*Ibid.*)

If a trial court grants diversion in a case where a defendant is statutorily ineligible, either because he or she has been charged with murder, voluntary manslaughter, or enumerated sexual assault offenses (§ 1001.36, subd. (b)(2)), and/or the claimed diagnosed mental disorders are "antisocial personality disorder, borderline personality disorder, and pedophilia" (§ 1001.36, subd. (b)(1)(A)), the concurring and dissenting opinion's position would prohibit the People from filing an immediate appeal from that order. If the People could appeal at that stage, they could move for a stay of execution, and ensure that the appellate court addresses the issue on the merits before a statutorily ineligible defendant could potentially successfully complete diversion and obtain dismissal of the charges.

While the People could file a petition for writ of mandate in such a situation and request the appellate court review a diversion order as being issued in excess of the trial court's statutory jurisdiction (*Mitchell, supra*, 184 Cal.App.4th at pp. 456–458), an appellate court's issuance of a writ of mandate is discretionary and not a matter of right, and the petition may be denied without reasons. (See, e.g., *Powers v. City of Richmond* (1995) 10 Cal.4th 85, 114.) Moreover, a petition for writ of mandate would be limited to narrow jurisdictional issues. The trial court's decision on a motion for diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence. (*Moine*, *supra*, 62 Cal.App.5th at pp. 447–449; *People v. Oneal*, *supra*, 64 Cal.App.5th 581.) The concurring and dissenting opinion's restrictive view of the People's ability to appeal the trial court's order would arguably preclude challenges where a court may have clearly abused its discretion in making the findings required by section 1001.36, including the critical consideration about whether a particular defendant "will not pose an unreasonable risk of danger to public safety" if placed on diversion (§ 1001.36, subd. (b)(1)(F)).

Finally, the concurring and dissenting opinion speculates that "the reason the Legislature has not given guidance on these uncertainties is because it did not intend for orders granting diversion to be appealable." (Conc. & dis. opn., *post*, at p. 12.) We have explained that our decision on this issue is based on section 1238, subdivision (a)(1). While *Wright* did not expressly rely on section 1238, it held that the People could file an appeal from a trial court's decision that granted a defendant's motion for diversion, it was decided in 1975, and it has not been reversed or questioned. The mental health diversion statutes at issue in this case were enacted by the Legislature in 2018. (*People v. Frahs*, *supra*, 9 Cal.5th at p. 624.) Perhaps the Legislature did not address appealability because

41

"the Legislature is presumed to know about existing case law when it enacts … a statute [citation], …" (*In re W.B.* (2012) 55 Cal.4th 30, 57.)[21]

## II. The People Have Forfeited Review of Their Contentions

In this appeal, the People argue the trial court's diversion order must be reversed because a social worker or an LCSW can never be a "qualified mental health expert" and testify in support of any motion for diversion under section 1001.36. The People acknowledge that section 1001.36 does not define the phrase "qualified mental health expert," but rely on cases interpreting other unrelated statutes to assert that only "a psychiatrist or licensed psychologist" is a "qualified mental health expert" who may testify at diversion hearings on the question of whether a defendant suffers from a mental disorder that was a significant factor in the commission of the charged offenses, and that the mental disorder would respond to mental health treatment. "[T]o allow anyone with lesser training and education than a licensed psychologist or psychiatrist to render a defendant eligible for [pretrial diversion] would be absurd." The People also argue that the testifying expert never gave an opinion as to whether Rodriguez would respond to mental health treatment in pretrial diversion.

Rodriguez argues the People have forfeited appellate review of the issue it has raised in this appeal – that only a psychiatrist or licensed psychologist can testify as a "qualified mental health expert" at any diversion hearing – because the People did not raise this same objection at the hearing on Rodriguez's motion. Rodriguez notes that at the diversion hearing in this case, the district attorney objected to Ms. Alves-McAuley's testimony for an entirely different reason – that Rodriguez's diversion motion asserted he

---

[21] In drug diversion cases, for example, the Legislature has expressly limited the *defendant's* ability to appeal, and states "[t]he sole remedy of a defendant who is found ineligible for pretrial diversion is a postconviction appeal" (§ 1000, subd. (b), as amended by Stats. 1996, c. 1132, § 2; *Butler v. Superior Court* (1998) 63 Cal.App.4th 64, 69), arguably a more serious limitation on a defendant's interests since he or she may not seek review until after there has been a resolution of the charged offenses.

suffered from Alzheimer's dementia, it was a medical condition and not a mental disorder, only a physician could testify to support a motion based on a medical diagnosis, and Alzheimer's dementia was not a mental disorder defined in the DSM-5. Rodriguez asserts the People cannot raise a new issue on appeal that was not raised below and have forfeited review of the issue it seeks to raise for the first time in this appeal.

We agree the People have raised an issue that was not presented at the diversion hearing and has thus forfeited review. It is well-settled that "[a] party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: 'There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion.' The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal. [Citation.]" (*People v. Morris* (1991) 53 Cal.3d 152, 187–188; *People v. Partida* (2005) 37 Cal.4th 428, 434.)

"[T]he objection [must] fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida, supra,* 37 Cal.4th at p. 435.)

"A century ago, long before the Evidence Code existed, we explained the need for a specific objection. 'To require this is simply a matter of fairness and justice, in order that cases may be tried on their merits. Had attention been called directly in the court below to the particular objection which it is now claimed the general objection of appellant presented, that court would have had a concrete legal proposition to pass on, and counsel for [respondent] would have been advised directly what the particular complaint against the question was, and, if he deemed it tenable, could have withdrawn the inquiry or reframed his question to obviate the particular objection…." (*People v. Partida, supra,* 37 Cal.4th at p. 434, citing *Bundy v. Sierra Lumber Co.* (1906) 149 Cal. 772, 776; *People v. Morris*, *supra*, 53 Cal.3d at pp. 187–188.)

" ' "An appellate court will ordinarily not consider procedural defects or [alleged] erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method .… The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver .… Often, however, the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' " [Citation.]" (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590.)[22]

## A.    *Failure to Object to an Expert Witness*

The forfeiture rule has been applied to an appellant's failure to object to the qualifications of an expert witness at trial, and then attempting to raise a new objection to the expert's testimony on appeal. (*People v. Doolin* (2009) 45 Cal.4th 390, 448; *People*

---

[22] "In this context, the terms 'waiver' and 'forfeiture' have long been used interchangeably. The United States Supreme Court … observed, however: 'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." [Citations.]' [Citation.]" (*People v. Saunders, supra*, 4 Cal.5th at p. 590, fn. 6.)

*v. Panah* (2005) 35 Cal.4th 395, 477–478; *People v. Farnam* (2002) 28 Cal.4th 107, 162.)

In *People v. Nwafor* (1996) 46 Cal.App.4th 39, the prosecutor called an expert witness to testify in a child molestation case. The expert had a doctorate in developmental psychology and over 10 years of experience working with child molestation victims. Defense counsel said he was satisfied the court would find that she was qualified to testify as an expert and did not object. On appeal, however, the defendant argued for the first time that the expert was not qualified, and the trial court improperly allowed her to testify. *Nwafor* held the defendant's contention was "frivolous and, since no objection was made in the trial court, untimely. [Citation.]" (*Id.* at p. 47.)

In *People v. Bolin* (1998) 18 Cal.4th 297, the prosecutor called a criminalist to testify about his review of photographs of a homicide scene. The criminalist testified to his opinion about the positions of the victims' bodies when they were shot, based on his analysis of the blood spatter and drips shown in the photographs. On appeal, the defendant argued for the first time that the criminalist was not qualified to testify as an expert, his opinions were inadmissible because he did not personally investigate the crime scene, and the testimony was prejudicial under Evidence Code section 352. *Bolin* held that "[s]ince [the defendant] failed to make these objections at trial, the issue is waived. [Citations.]" (*Bolin*, at p. 321.)

In *People v. Farnam, supra,* 28 Cal.4th 107, a criminalist testified as a prosecution expert on blood spatters, reviewed photographs of the homicide scene, and gave his opinion about the sequence of events and length of time leading to the victim's sexual assault and murder. (*Id.* at p. 161.) At trial, defense counsel objected to the criminalist's blood spatter testimony "as assuming facts not in evidence, speculative, and conclusory. But counsel affirmatively stated they had no objection if [the criminalist] were to 'reconstruct the way the crime may have occurred' and did not challenge [the criminalist's] qualifications to provide expert opinion on blood spatters." (*Id.* at p. 162)

On appeal, however, the defendant argued for the first time that the criminalist "was not qualified to render an expert opinion on blood spatters [citation] and that therefore his conclusions as to the sequence of events were conjectural and speculative." (*Id*. at pp. 161–162.) *Farnam* rejected the defendant's appellate claim because "[a]t most, [defense] counsel objected to [the criminalist's] qualifications with respect to estimating the amount of time elapsing from the start to the finish of the attack on the victim. Consequently, the defendant's challenges to [the criminalist's] testimony regarding blood spatters and crime scene reconstruction have been forfeited. [Citations.]" (*Id*. at p. 162.)

In *People v. Panah, supra*, 35 Cal.4th 395, the defendant objected to a hypothetical question posed to the prosecution's forensic serologist. During a sidebar hearing on that objection, "defense counsel disparaged [the serologist's] qualifications but the reason he sought [an Evidence Code section] '402 hearing' was because he claimed the attempted hypothetical question amounted to a 'new theory.' " (*Id*. at p. 477.) The trial court denied the request, stated it was satisfied the witness was an expert, and held defense counsel could cross-examine him about his opinions. (*Ibid*.) On appeal, the defendant claimed the trial court erroneously denied his motion for a hearing pursuant to Evidence Code section 402 about the expert's qualifications to testify to his opinions. *Panah* held the defendant forfeited this argument because "[t]he record reveals … that [the] defendant never made such a request" (*Panah*, at p. 477), he only requested an evidentiary hearing because of an objection to a particular hypothetical question, and concluded that the "[d]efendant's failure to have challenged [the serologist's] expert qualifications in the trial court forfeits his claim. [Citation.]" (*Id*. at p. 478.)

## B.  *The People Forfeited Review of Their Appellate Claim*

It is clear that during the entirety of the proceedings in this case, the People never raised the broad objection that is being asserted in this appeal in either the written opposition to Rodriguez's diversion motion or at the two hearings on that motion – that

46

only a psychiatrist or licensed psychologist is a "qualified mental health examiner" who may testify in support of any diversion motion brought under section 1001.36.

Instead, the People's objections at the diversion hearing were based on the allegations in Rodriguez's motion that he suffered from Alzheimer's dementia, and that it was a mental disorder that qualified him for diversion. In response to Rodriguez's motion, the People argued that Alzheimer's dementia was a medical diagnosis, and that only a physician, and Ms. Alves-McAuley, as an LCSW, could make or testify about whether an Alzheimer's diagnosis supported a diversion motion.

As in *Nwafor, Bolin, Farnam,* and *Panah*, the People have raised a new objection to the expert's testimony in this appeal that was not made before the trial court and has thus forfeited appellate review of this claim.

In response to Rodriguez's appellate claim of forfeiture, the People conceded in their reply brief and at oral argument that they did not raise this issue at the diversion hearing or argue that a social worker or LCSW could never testify as a qualified mental health examiner under section 1001.36. However, the People assert this court must still address the new issue raised on appeal because it simply presents a question of law based on undisputed facts.

The People primarily rely on *People v. Yeoman* (2003) 31 Cal.4th 93 (*Yeoman*) in support of this assertion. In *Yeoman*, the defendant objected at voir dire that the People were improperly using peremptory challenges to exclude African-Americans from the jury in violation of *People v. Wheeler* (1978) 22 Cal.3d 258. The trial court made factual findings and held the defendant failed to make a prima facie case under *Wheeler*. On appeal, the defendant renewed his *Wheeler* arguments and, for the first time on appeal, asserted an equal protection claim based on *Batson v. Kentucky* (1986) 476 U.S. 79. The People claimed the defendant waived any appellate claim of *Batson* error because he failed to raise it during voir dire. (*Yeoman, supra*, 31 Cal.4th at pp. 115–116.)

*Yeoman* held that the defendant did not waive the *Batson* argument:

47

"[W]e believe that to consider defendant's claim under *Batson ...* is more consistent with fairness and good appellate practice than to deny the claim as waived.  As a general matter, no useful purpose is served by declining to consider on appeal a claim that merely restates, under alternative legal principles, *a claim otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal*.  Defendant's *Batson* claim is of that type.  His motion under *Wheeler* … required the trial court to conduct *the same factual inquiry* required by *Batson* into the possibly discriminatory use of peremptory challenges, and to apply a standard identical to *Batson's* for determining whether [the] defendant had stated a prima facie case.  [Citation.]  Under these circumstances, the *Batson* claim is properly cognizable on appeal by analogy to the well-established principle that a reviewing court may consider a claim raising a pure question of law on undisputed facts.  [Citations.]  While [the] defendant does dispute the trial court's resolution of the factual issues underlying his *Batson* claim (i.e., whether he stated a prima facie case and whether the prosecutor's explanation was adequate), the same factual issues are properly before us already because of [the] defendant's timely *Wheeler* motion.  *Under these circumstances, to consider the Batson claim entails no unfairness to the parties, who had an opportunity to litigate the relevant facts and to apply the relevant legal standard in the trial court.*  Nor does it impose any additional burden on us, as the reviewing court.  [¶]  Accordingly, we may properly consider [the] defendant's *Batson* claim on the merits.  Doing so, we conclude it fails for the same reason his *Wheeler* claim fails."  (*Yeoman, supra*, 31 Cal.4th at pp. 117–118, italics added, fn. omitted.)

We find *Yeoman* does not support the People's claim that we must address the admittedly new challenge to the expert it has raised in this appeal.  In contrast to *Yeoman*, the People have not raised a claim, under alternative legal principles, that is "otherwise identical to one that was properly preserved by a timely motion that called upon the trial court to consider the same facts and to apply a legal standard similar to that which would also determine the claim raised on appeal."  (*Yeoman, supra*, 31 Cal.4th at p. 117.)  Instead, the People have raised a completely different argument that was never addressed by either the court or Rodriguez at the diversion hearing.

Next, as the People concede, section 1001.36 does not define a "qualified mental health professional," and the People's arguments about what type of expert falls within

that phrase are based on analogizing the diversion statute to other unrelated statutory proceedings. There is thus no argument that the court issued an order in this case that was facially void as a matter of law.

Third, the People's attempt to raise a new issue in this particular case illustrates the importance of why a party must comply with Evidence Code section 353 and raise a timely objection before the trial court. "[A] specifically grounded objection" that a social worker or LCSW could never testify as a qualified mental health examiner in any diversion hearing would have allowed "the trial judge to consider excluding the evidence," and "the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal. [Citation.]" (*People v. Morris, supra,* 53 Cal.3d at pp. 187–188; *People v. Partida, supra,* 37 Cal.4th at p. 434.)

As demonstrated above, the People's repeated objections to Ms. Alves-McAuley's testimony were based on the nature of Rodriguez's diversion motion – that he was diagnosed with Alzheimer's dementia, it was a medical disease that could only be diagnosed by a physician and, as a result, only a physician could testify in support of Rodriguez's motion. When the court overruled that objection, the People argued Ms. Alves-McAuley's testimony violated the hearsay rule because she was relying on the records from Rodriguez's treating physicians that stated they had diagnosed him with Alzheimer's dementia. The court properly overruled that objection and correctly found that section 1001.36 defined a diversion hearing as an "informal" proceeding and permitted the introduction of medical reports and other "reliable hearsay."

The People then argued that Alzheimer's dementia was no longer defined as a "mental disorder" in the DSM-5 and, even if it was, it was incurable and thus not subject to treatment. The court correctly overruled these objections, found that Alzheimer's dementia was still listed in DSM-5 under the alternate heading of neurocognitive disorders, and such a person could benefit from the appropriate treatment.

49

In the course of raising these objections, the People did not argue that an LCSW could never be considered a qualified mental health expert who could offer an opinion in support of any diversion motion brought under section 1001.36.  If such an objection had been raised, the trial court could have held a hearing on that particular issue and, if it was inclined to grant the motion, Rodriguez's attorney may have decided to request a continuance to call one of his treating physicians to testify in support of the motion.

Given the People's failure to raise the issue, Rodriguez did not have the opportunity to consider an alternate strategy to ensure the motion would be properly supported.  " ' "[I]t is *unfair to the trial judge and to the adverse party* to take advantage of an [alleged] error on appeal when it could easily have been corrected at the trial." ' [Citation.]" (*People v. Saunders, supra,* 5 Cal.4th at p. 590.)  The People thus forfeited appellate review of its new challenge to the expert testimony of Ms. Alves-McAuley.[23]

### C.  *The Court's Finding that Rodriguez Would Benefit from Treatment*

Finally, the People assert on appeal that the trial court failed to make a finding that "the opinion of a qualified mental health expert established that 'symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment' as required by section 1001.36, subdivision (b)(1)(C)."  The People complain the court improperly granted diversion simply because of Rodriguez's satisfactory conduct after he was released from custody in this case and assert a diversion order cannot be based on "a finding that the symptoms motivating criminal behavior are amendable to treatment based on performance while out of custody, only on the opinion of a qualified mental

---

[23] We note that in granting the diversion motion, the trial court stated that it was also finding Rodriguez suffered from a mental disorder based on Corizon's mental health assessment, conducted shortly after he was arrested, that Rodriguez suffered from bipolar disorder.  The district attorney never challenged the admission of Corizon's report, raised a hearsay objection to the court's consideration of the report, or argued the report's conclusions were invalid because Rodriguez was examined by a licensed mental health clinician.

health expert." The People argue the court did not rely on any expert opinion to find Rodriguez established the statutory elements for diversion, and it improperly based the order on "his remaining crime free while out of custody."

The People have misstated the nature of the court's findings. At the diversion hearing, the district attorney argued that Rodriguez could not benefit from treatment because Alzheimer's dementia was a fatal and incurable disease. However, section 1001.36, subdivision (b)(1)(C) does not require proof that the mental disorder would be *cured* by treatment, but instead that "the defendant's *symptoms of the mental disorder* motivating the criminal behavior would *respond* to mental health treatment." (Italics added.)

Indeed, the court's finding was consistent with Ms. Alves-McAuley's report filed in support of Rodriguez's motion, where she acknowledged that he suffered from "an incurable and worsening disease" but, in her opinion, "his family and doctors have found a way to work together and *manage his symptoms*. I believe that continued medication management as well as the support of his family will maintain Mr. Rodriguez's current stability and allow him to safely remain in his home and avoid reoffending." (Italics added.)

The court correctly overruled the district attorney's objections, found Rodriguez would benefit from treatment for his symptoms, and there was sufficient specificity in the proposed plan for him to continue to receive the same care provided by his physician and family that started after he was released from custody in March 2018 – continued close supervision at home to ensure he did not wander away or resume drinking, compliance with prescribed medications that had already stabilized his condition, and regular status reports from his primary care physician. The court did not grant the diversion motion simply because Rodriguez had remained crime free prior to the diversion hearing, but instead relied on a plan that had already started to address Rodriguez's symptoms.

51

We thus conclude that the People forfeited review of its new claim about the definition of a "qualified mental health expert," and affirm the trial court's order on October 4, 2017, that granted Rodriguez's motion for pretrial diversion.

## **DISPOSITION**

The court's order of October 4, 2019, granting Rodriguez's motion for pretrial diversion, is affirmed.

Rodriguez's motion filed on April 20, 2021, to "dismiss [this] appeal as moot" is itself dismissed as moot.


POOCHIGIAN, J.

I CONCUR:


LEVY, ACTING P.J.

52

SNAUFFER, J., Concurring and Dissenting.

I agree with the majority's conclusion that the People forfeited the claim they raise on appeal. However, this appeal must be dismissed without reaching the merits for lack of jurisdiction because the order appealed from is not appealable by the People.

" 'The prosecution's right to appeal in a criminal case is strictly limited by statute. [Citation.] Long standing authority requires adherence to these limits even though the "the People may thereby suffer a wrong without a remedy." [Citation.] The circumstances allowing a People's appeal are enumerated in [Penal Code]**1** section 1238.' " (*In re Anthony* (2015) 236 Cal.App.4th 204, 211 (*Anthony*), quoting *People v. Chacon* (2007) 40 Cal.4th 558, 564; see also *People v. Drake* (1977) 19 Cal.3d 749, 754, superseded in part by statute as stated in *People v. Statum* (2002) 28 Cal.4th 682 [" 'The Legislature has determined that except under certain limited circumstances the People shall have no right of appeal in criminal cases' [Citation]. Those circumstances are enumerated in section 1238."].) " ' "[C]ourts are precluded from so interpreting section 1238 as to expand the People's right of appeal into areas other than those clearly specified by the Legislature." ' " (*Anthony*, at p. 211.)

The People do not state any grounds of appealability under section 1238 in either their notice of appeal or opening brief. Instead of relying on statutory grounds, the People claimed in their notice of appeal the order granting diversion is appealable "pursuant to *People v. Wright* (2002) 99 Cal.App.4th 201, 204 [(*Wright 2002*)] and Cal. Rule of Court 8.304."**2** Their opening brief's statement of appealability, which reads as follows, only cites case law:

"An 'order granting diversion is analogous to a final judgment in a "special proceeding" [(*People v. Murphy* (1969) 70 Cal.2d 109, 115

---

**1** Undesignated statutory references are to the Penal Code.

**2** California Rules of Court, rule 8.304 sets forth the rules for filing appeals and does not enumerate grounds for appeal.

(*Murphy*))], and hence is final for the purposes of appellate review. "… It is not the form of the decree but the substance and effect of the adjudication which is determinative.' " ' (*People v. Mazurette* (2001) 24 Cal.4th 789, 797 [(*Mazurette*)], quoting *People v. Wright* (1975) 47 Cal.App.3d 490, 492 [(*Wright (1975)*)].) An order granting pretrial diversion is thus appealable by the People. (*People v. Wright* (2002) 99 Cal.App.4th 201, 204 [*Wright (2002)*]; see also *People v. Alonzo* (1989) 210 Cal.App.3d 466, 468 [(*Alonzo*)] in which this court held an order granting pretrial diversion was properly appealable by the People under *Wright (1975)*."

It was not until their supplemental brief that the People finally contended their appeal was authorized under section 1238, subdivision (a)(1) and (a)(8). They stated: "Granting diversion is essentially a conditional or delayed termination of the action and setting aside of the complaint or information. Although the appeal is available upon the actual dismissal of the case, that option was also available in 1975 when the *Wright* [(*1975*)] case was decided and the court still determined it to be a final order and appealable by the People."

I will first address why section 1238 does not authorize the People's appeal from an order granting pretrial mental health diversion issued under section 1001.35, et seq. I will then demonstrate how the cases upon which the People rely also do not allow this appeal.

## A.     Section 1238

Section 1238, subdivision (a), provides in relevant part:

> "(a) An appeal may be taken by the [P]eople from any of the following:

> "(1) An order setting aside all or any portion of the indictment, information, or complaint.

> "(8) An order or judgment dismissing or otherwise terminating all or any portion of the action including such an order or judgment after a verdict or finding of guilty or an order or judgment entered before the defendant has been placed in jeopardy or where the defendant has waived jeopardy."

2.

The order appealed from here plainly does not fall under either of these subdivisions.  The order appealed from is an order granting diversion—that is all the order does.  The order does not set aside the information (subd. (a)(1)) or dismiss or terminate any portion of the action (subd. (a)(8)).

The majority cites to *People v. McClaurin* (2006) 137 Cal.App.4th 241 (*McClaurin*), which held that when determining whether an order is appealable under section 1238, subdivision (a)(1), "courts consider the form, substance and effect of the order."  (*Id.* at p. 247.)  "While an order may not be specifically listed as an appealable order under section 1238, if the substance of the order *has the purpose and ultimate effect* of setting aside all or any portion of the … information[,] then the order is appealable under section 1238, subdivision (a)(1)."  (*Ibid.*, italics added.)  As will be discussed below, this holding is inapplicable here.

An order granting pretrial mental health diversion does not have "the purpose and ultimate effect" of setting aside the information (or complaint or indictment).  Its only purpose and effect are to place the defendant on diversion—*that's it*.  An order granting diversion can never, by itself, set aside the information or have the effect of setting aside the information.  Dismissing the charges—which effectively sets aside the information— requires the trial court to enter a subsequent order discharging the defendant from diversion and dismissing the charges, and that subsequent order is the one that is arguably appealable under section 1238, subdivisions (a)(1) and (a)(8).

Conceptualized differently, an order granting diversion merely starts a defendant on the road toward *possibly* getting the charges dismissed—and the information effectively set aside.  When the time comes to discharge the defendant from diversion and dismiss the charges because he or she has successfully completed his or her diversion program, a subsequent order must be entered to that effect; the diversion order cannot effectuate a dismissal of the charges.  The majority correctly notes the trial court must

3.

discharge the defendant and dismiss the charges once the defendant has successfully completed diversion.  (§ 1001.36, subd. (e).)  However, the diversion order does not effectuate the dismissal—a subsequent order does.  Unless the subsequent dismissal order is entered, the charges will never be dismissed.

It is thus clear that (1) the order granting diversion and (2) the subsequent order discharging the defendant and dismissing the charges do not have the same purpose and ultimate effect of setting aside the information.  These two orders serve entirely different purposes in the statutory mental health diversion scheme (§ 1001.35, et seq.), and the majority fails to recognize this.

A somewhat analogous example in the civil law arena is the rule that one cannot appeal from an order granting a motion for summary judgment, but only from the summary judgment entered after the order.  (*Saben, Earlix & Associates v. Fillet* (2005) 134 Cal.App.4th 1024, 1030 ["[A] summary judgment is appealable, but an order granting summary judgment is not."].)  Just as in the criminal law arena, it is a jurisdictional axiom in the civil law arena that appellate courts cannot entertain appeals taken from nonappealable judgments or orders.  (*City of Calexico v. Bergeson* (2021) 64 Cal.App.5th 180, 189; see *Farwell v. Sunset Mesa Property Owners Assn, Inc.* (2008) 163 Cal.App.4th 1545, 1550 ["question whether an order is appealable goes to the jurisdiction of an appellate court, which is not a matter of shades of grey but rather of black and white"].)  It does not matter that in summary judgment proceedings the judgment entered hardly ever adds anything substantive to what is stated in the order granting the motion because it is a jurisdictional axiom, not a mere technicality to be disregarded.  And in the mental health diversion context, there is an obvious substantive difference between an order granting diversion and the subsequent order dismissing the charges in that they have distinct purposes and effects.

The facts of *McClaurin, supra,* 137 Cal.App.4th 241 also are distinguishable. That case involved the trial court's grant of a defendant's motion for specific performance of a plea agreement from which the People withdrew. (*Id.* at pp. 245—246.) "[W]hen the court ordered specific performance, it dismissed all the pending charges … and amended the complaint to include [a lesser charge]." (*Id.* at p. 247.) Thus, a single order alone resulted in the dismissal of the charges. The Court of Appeal held that order was appealable under section 1238, subdivision (a)(1), because it "had the effect of 'setting aside all or any portion of the … complaint.' " (*Id.* at pp. 247—248.) That was the correct decision there, but the situation here is significantly different. Again, an order granting pretrial mental health diversion does not have the purpose and ultimate effect of dismissing the charges (and setting aside the information). Its only purpose and effect are to start the defendant on diversion, with the *possibility* that the charges could one day be dismissed—effectively setting aside the complaint—with a subsequent dismissal order upon successfully completing diversion.

In sum, the majority fails to recognize the difference in the purpose and ultimate effect of (1) an order granting diversion and (2) an order discharging the defendant from diversion and dismissing the charges upon successful completion of diversion. To say these orders have the same purpose and ultimate effect is to say that the order granting diversion operates as a dismissal order. An order granting diversion never acquires the capacity to effectuate a dismissal; that being the case, an order granting diversion does not fall under subdivision (a)(1) or (a)(8) of section 1238.

It is within the Legislature's province to define the People's appellate rights. If the Legislature wanted to allow the People to appeal an order granting pretrial mental health diversion, it could easily have added that order to the list of appealable orders in section 1238, subdivision (a). The Legislature did not do that, and it is an unwarranted

5.

invasion of the Legislature's province for this court to allow the People to appeal from this order.

**B.     Case law**

The cases the People cite in their opening brief do not alter the conclusion that the order appealed from here is not appealable.  Their primary case is *Wright (1975), supra,* 47 Cal.App.3d 490.  In that case, "the defendant was charged with a nondivertable drug offense but found guilty of a lesser crime that, had it been the original charge, would have qualified the defendant for pretrial diversion.  After trial, the defendant requested diversion [under section 1000] and the trial court granted the request.  The People appealed, claiming the trial court had acted in excess of its jurisdiction.  At the threshold, the appellate court was required to decide whether the People could appeal the lower court's order granting diversion.  It found in the affirmative, reasoning 'the order granting diversion is analogous to a final judgment in a "special proceeding" [(*Murphy, supra,* 70 Cal.2d at p. 115)], and hence is final for the purposes of appellate review.  "… It is not the form of the decree but the substance and effect of the adjudication which is determinative." ' " (*Mazurette, supra,* 24 Cal.4th at p. 797, italics omitted.)

The *Wright (1975)* court did not mention section 1238, which at the time read in relevant part:

> "(a) An appeal may be taken by the [P]eople:

> "(1) From an order setting aside the indictment, information, or complaint.

> "(8) From an order or judgment dismissing or otherwise terminating the action before the defendant has been placed in jeopardy or where the defendant has waived jeopardy." (Stats. 1970, ch. 1289, § 1.)[3]

---

[3] Section 1238 was not amended again until 1978.  (Stats. 1978, ch. 1359, § 2.)

6.

Note that these subdivisions are substantively the same as they are now, with a slight difference in subdivision (a)(8) not relevant here.

In my view, the appealability question in *Wright (1975)* was incorrectly decided, because that case involved a People's appeal from an order granted in a criminal proceeding, yet the Court of Appeal ignored section 1238 and instead concluded by analogizing to statutes in the Code of Civil Procedure governing civil appeals from final judgments that the order was appealable. As *Wright (1975)* involved a criminal proceeding, the People's right to appeal from anything in that case was strictly governed by the Penal Code. It is perplexing that the *Wright (1975)* court looked to the Code of Civil Procedure for a ground to authorize the *criminal* appeal before it.

To understand how the *Wright (1975)* court reached the conclusion that it did, one must read *Murphy, supra,* 70 Cal.2d 109. *Wright (1975)* held the order appealed from in that case was analogous to a final order in a "special proceeding" without defining that term, instead providing a citation to *Murphy*. A close reading of *Murphy* reveals the error in the *Wright (1975)* court's reliance on it to conclude a People's appeal from an order granting diversion in a criminal proceeding is appealable.

In *Murphy,* the defendant pleaded guilty to one felony count of possession of marijuana. (*Murphy, supra,* 70 Cal.2d at p. 113.) His then counsel "advised the court that he had reason to believe [Murphy] was eligible for the narcotics addict rehabilitation program, and requested that the criminal proceedings be adjourned and proceedings for civil commitment be initiated under Welfare and Institutions Code section 3051." (*Ibid.*) The trial court agreed with the request and the prosecutor filed a petition for commitment the next day. (*Ibid.*)

At the hearing on the petition, Murphy's new counsel moved to withdraw the plea of guilty to the criminal charge, for an immediate jury trial on the issue of addiction, and to disqualify the judge by peremptory challenge. (*Murphy, supra,* 70 Cal.2d at pp. 113—

7.

114.) The trial court denied the motions, and after hearing evidence found Murphy to be in imminent danger of addiction and ordered him committed to the rehabilitation program. (*Id.* at p. 114.) The same day, Murphy filed a notice of appeal *from the order of commitment*. (*Ibid.*)

On appeal, Murphy challenged the commitment order, and also raised two contentions challenging his conviction for possession of marijuana. (*Murphy, supra,* 70 Cal.2d at p. 114.) The Supreme Court ruled Murphy could not litigate those two challenges to the conviction in *that* appeal. (*Ibid.*) The Court explained Murphy could not "use his right to appeal from the order of *civil* commitment as yet another vehicle to attack his criminal conviction. [Citations.] Both in form and in substance, the civil commitment proceedings are wholly distinct from the criminal prosecution. The commitment order is appealable only because it is deemed to be a final judgment in a 'special proceeding' (Code Civ. Proc., § 963, subd. 1; [citation]), and the contours of that proceeding delimit the scope of its review: 'in such appeal he may base error only on the lack of jurisdiction of the trial court to institute commitment proceedings or the invalidity of the proceedings culminating in the order itself.' " (*Id.* at pp. 114—115, fn. omitted.) The Court also explained the available routes under the Penal Code for Murphy to challenge his criminal conviction. (*Id.* at 114.)

Former Code of Civil Procedure section 963, which governed appeals from the superior court, provided in part that an appeal may be taken "1. From a final judgment entered in an action, or special proceeding, commenced in a superior court, or brought into a superior court from another court." (Former Code Civ. Proc., § 963, subd. 1, repealed by Stats. 1968, c. 385, p. 811, § 1; *Draus v. Alfred M. Lewis, Inc.* (1968) 261 Cal.App.2d 485, 488.) The commitment order in *Murphy* was appealable under this former provision of the Code of Civil Procedure because it was issued in the course of a civil proceeding—more specifically, a "special proceeding." As the *Murphy* court stated:

"[T]he civil commitment proceedings are wholly distinct from the criminal prosecution." (*Murphy, supra,* 70 Cal.2d at p. 114—115.)  By contrast, any challenge to the criminal conviction was appealable under the Penal Code because it resulted from criminal proceedings.  In short, *Murphy* involved a criminal proceeding and a separate civil proceeding, and the Supreme Court's holding implied that a challenge to the latter did not necessarily subsume a challenge to the former, at least in the particular circumstances of that case.

The defendant in *Wright (1975), supra,* 47 Cal.App.3d 490, was granted diversion under provisions of the Penal Code, not the Welfare and Institutions Code or any other code.  (*Id.* at p. 492.)  Nevertheless, the Court of Appeal there impliedly concluded that case involved "special proceeding[s]"—or at least something analogous to "special proceedings"—as defined by the Code of Civil Procedure.  (*Ibid.*)  This was clearly erroneous.  I also note the version of Code of Civil Procedure section 963 that existed at the time *Murphy* was decided was repealed in 1968.

To clarify the distinction between the cases:  *Murphy, Wright,* and Rodriguez's case each involved appeals from orders granting diversion, but this similarity is inconsequential.  The crucial distinction is that *Murphy* involved an appeal from a diversion order entered in a civil proceeding governed by the appealability rules of the Code of Civil Procedure.  In contrast, *Wright (1975)* and Rodriguez's case involve appeals from a diversion order entered in a criminal proceeding governed by the Penal Code's appealability rules, namely section 1238.  Neither the *Wright (1975)* court nor the majority in this case recognize this distinction.

Another crucial aspect of *Murphy, supra,* 70 Cal.2d 109, that the *Wright (1975), supra,* 47 Cal.App.3d at p. 492, court failed to note is that *Murphy* involved an appeal by the defendant, not the People.  Thus, even if it were assumed for sake of argument that the proceedings in *Wright (1975)* involved "special proceedings" under the Code of Civil

9.

Procedure, the Court of Appeal there failed to explain how the diversion order was appealable *by the People.* Indeed, the *Wright (1975)* court did not state any statutory grounds that allowed the People's appeal of the diversion order in that case.

For the foregoing reasons, I do not find that *Wright (1975)* is valid authority regarding the appealability of diversion orders under the Penal Code. The order appealed from in *Wright (1975)* did not satisfy any section 1238 ground; indeed, the court there did not even try to show that it did. Instead, the *Wright (1975)* court erroneously concluded the order appealed from there was authorized by drawing an analogy to the Code of Civil Procedure. In doing so, the *Wright (1975)* court essentially created a new, non-statutory ground of appeal for the People, which it had no power to do.

None of the other cases the People cited in their opening brief regarding appealability affect my analysis. In *Mazurette, supra,* 24 Cal.4th 789, the Supreme Court briefly discussed *Wright (1975), supra,* 47 Cal.App.3d at p. 492, to distinguish it on its procedural posture. There*,* the defendant pleaded no contest to drug possession after the trial court denied her motion to suppress evidence. (*Mazurette,* at p. 791.) Entry of judgment was deferred pursuant to section 1000 et seq., and she entered a drug rehabilitation program. (*Ibid.*) She immediately appealed the trial court's decision denying her suppression motion, and the Court of Appeal dismissed her appeal for lack of appealability. The Supreme Court granted review to decide whether sections 1000—1000.4 preclude a defendant from immediately appealing the trial court's denial of a suppression order.

The *Mazurette* defendant cited *Wright (1975), supra,* 47 Cal.App.3d at p. 492, as one of the cases she contended required the court "to take a functional approach to decide whether a particular order is appealable." (*Mazurette, supra,* 24 Cal.4th at p. 797.) The Supreme Court stated *Wright (1975)* was of no assistance to Mazurette because *Wright (1975)* "concerned the ability of the People to appeal pursuant to section 1238, rather

10.

than a defendant's right to appeal under section 1237[.]" (*Ibid.*) Thus, the Supreme Court distinguished *Wright (1975)* based on the party appealing. The Supreme Court did not endorse the substantive reasoning of *Wright (1975)*. Also, it is unclear why the Supreme Court stated that *Wright (1975)* concerned the People's ability to appeal under section 1238, when in fact the *Wright (1975)* decision regarding appealability was not at all statutorily based.

Finally, neither *Wright (2002), supra,* 99 Cal.App.4th 201, nor *Alonzo, supra,* 210 Cal.App.3d 466, is persuasive because they simply cite to *Wright (1975), supra,* 47 Cal.App.3d 490, without additional analysis. In *Wright (2002),* the defendant was convicted of drug possession offenses and the trial court granted his motion to defer entry of judgment. (*Wright (2002),* at p. 203.) The People appealed. (*Ibid.*) In addressing the question of appealability, the Court of Appeal began by quoting the rule that a judgment or appeal is not appealable unless expressly made so by statute. (*Id.* at pp. 203—204.) However, in giving an applicable statutory basis for the People's appeal, the Court of Appeal concluded the People were entitled to appeal from the trial court's order under the reasoning of *Wright (1975).* (*Id.* at p. 204.) Similarly, in *Alonzo, supra* 210 Cal.App.3d 466, the defendant was convicted of drug possession and granted diversion for rehabilitation under section 1000, and the People appealed the order granting diversion. (*Id.* at p. 468.) The Court of Appeal relied on *Wright (1975)* in concluding the People could appeal the order. (*Ibid.*)

In conclusion, I do not believe that *Wright (1975), supra,* 47 Cal.App.3d 490, provides a basis for concluding the People may appeal from an order granting mental health diversion under section 1001.35, et seq. Additionally, none of the other three cases the People rely on that cite *Wright (1975)* are helpful to the People. The fundamental axiom should endure: " 'The prosecution's right to appeal in a criminal case is strictly limited by statute.' " (*Anthony, supra,* 236 Cal.App.4th at p. 211.)

11.

## C.     Procedural quandaries

Finally, I am concerned about the procedural and administrative issues that may occur if the People can appeal from pretrial mental health diversion orders. The majority does not address what effect the filing of a People's appeal from an order granting diversion will have. Is the diversion order stayed? Does the defendant have to comply with the terms of his or her diversion program while the appeal is pending? Does the trial court retain jurisdiction to hold violation hearings or to discharge a defendant who has successfully completed diversion and dismiss his or her case? Would the People be able to essentially preclude effective court ordered diversion by simply filing an appeal? The problems these uncertainties are likely to cause judges, counsel, and, most regrettably, divertible defendants with mental illnesses, are something to be avoided. Perhaps the reason the Legislature has not given guidance on these uncertainties is because it did not intend for orders granting diversion to be appealable. I would hope the Legislature will provide clarification on the appealability of pretrial mental health diversion orders.


SNAUFFER, J.

12.